FEDERAL LAND BANK OF BALTIMORE, INC.
ET AL. *v.* OTIS G. ESHAM ET AL.

[No. 905, September Term, 1978.]

*Decided October 9, 1979.*

The cause was argued before MOORE, LOWE and MELVIN, JJ.

*David H. Clark* and *George G. Strott, Jr.,* with whom were *Cullen, Clark & Insley* on the brief, for appellants.

*Gary A. Goldstein* and *Stanton J. Levinson,* with whom were *Schimmel & Tatelbaum, P.A.* on the brief, for appellees.

MOORE, J., delivered the opinion of the Court.

This complex appeal and cross-appeal have their origins in the decline, fall, and dismemberment by foreclosure sale of the Esham chicken enterprises on the Eastern Shore of Maryland. Originally, there were three separate actions — two in Baltimore City and one in Wicomico County — which

were consolidated for trial in the Circuit Court for Wicomico County. The trial court refused to grant either side the complete relief which was sought, and both sides then appealed to this Court.

The mortgagees, Federal Land Bank of Baltimore, Inc. and Marva Production Credit Association [hereinafter Banks], as appellants, principally complain of an alleged computational error by the lower court in its attempt to sort out the accounting muddle remaining in the wake of the mortgagors' default and the foreclosure of the various mortgages. The mortgagors, Otis G. Esham, members of his family, and family-owned corporations [hereinafter Eshams], as cross-appellants, object to the following aspects of the foreclosure proceedings: (1) the Banks' attempted foreclosure on individually owned property in contravention of an agreement between the parties; (2) the payment to the Trustee in Bankruptcy of $275,000 from the proceeds of a foreclosure sale pursuant to a settlement agreement between the Banks and the Trustee; (3) the inadequacy of the price for property purchased by the Banks at foreclosure; (4) the sale at foreclosure of Worcester County property in Wicomico County; and (5) the lack of notice provided to the Eshams in advance of the sale of chattels at foreclosure.

I

Appellant Banks are federally-chartered [1] institutions designed to provide financial assistance to farmers. The Federal Land Bank supplies long-term loans while the Production Credit Association furnishes loans of short duration. Between 1970 and 1974, the Banks made seven loans, secured by mortgages or deeds of trust, to the Eshams to finance their chicken processing business.

Otis G. Esham was the controlling force behind the Esham integrated poultry business which consisted of several corporate entities, the chief of which was Maryland Chicken Processors, Inc. Although Mr. Esham was the dominant figure in the business, his wife, and their sons and their wives

---

1. 12 U.S.C. § 2001-2259 (1976).

were all involved in some facet of the operations, particularly as signatories on the notes evidencing the debts owed to the Banks. The notes, mortgages, and deeds of trust executed by the Eshams were signed in both corporate and individual capacities and encumbered both corporate and individual property.

In early 1974, the Eshams began to experience severe financial problems. Later that same year, the Banks, in an attempt to forestall financial disaster, agreed to finance a "grow-out" operation at the Esham hatcheries. This permitted the production of all chicks that had already been hatched for the current market season.[2] All proceeds from the "grow-out" were to be applied to the Eshams' debt of $3,007,935.73. Unfortunately, however, this arrangement did not produce funds sufficient to satisfy the outstanding debts. As a consequence, in July 1974, Maryland Chicken Processors, Inc. was forced into bankruptcy, and John A. Payne of Snow Hill was appointed the Trustee.

Under federal bankruptcy law, an automatic stay prohibited the sale of corporate property, by foreclosure or otherwise. Since the Trustee opposed the lifting of the stay, the Banks, in December 1974, filed a complaint in the bankruptcy proceeding to have it removed. In an effort to resolve the controversy, the Banks and the Trustee participated in several hearings before the bankruptcy court in early 1975. By October 1975, however, the stay was still in effect. While awaiting a decision on the Banks' complaint, the Trustee and the Banks were able to reach a settlement agreement whereby the Trustee would consent to the foreclosure sales in exchange for the sale proceeds from the foreclosure on six corporate farms.[3] The Eshams were not

---

2. The "grow-out" operation was designed to reduce operating costs and losses by raising only the chicks that had been hatched, thereby sacrificing future growth. Unhatched eggs were to be destroyed. The demise of the poultry business was, therefore, inevitable.

3. The agreement divided the real property held by Maryland Chicken Processors, Inc. into two classes: the "farm" properties and the "operating" properties. The Trustee was to receive the proceeds from the sale of the "farm" properties, except for the proceeds of sale of chattels on the "farm" properties. In addition, the agreement provided for the sharing of foreclosure sale expenses between the Trustee and the Banks and also for various contingencies in the event of surpluses or deficiencies resulting from the sales.

parties to the agreement, which was approved by the bankruptcy court on October 23, 1975.

When the foreclosure sale was advertised, the Eshams obtained a temporary injunction enjoining it; but they ultimately stipulated to an order of sale, and the injunction was lifted. On December 5, 1975 the sale took place. Pursuant to the settlement agreement, the Banks paid the Trustee $275,000, representing his share of the proceeds. In accounting for this payment on their own books, the Banks listed it as an expense of the sale, thereby charging $275,000 to the Esham account.

At the foreclosure sale the Banks themselves purchased three corporate properties — processing plants at Nanticoke and Snow Hill and a hatchery at Parsonsburg—for $330,000. They subsequently entered into a contract for the sale of the foreclosed properties along with the Laurel, Delaware feed mill (which was not subject to immediate foreclosure) to a third party, Champion Chicken Products Corporation. The Eshams and the Banks had stipulated that $500,000 of the $1,500,000 contract price would be allocated to the Delaware feed mill, giving the Eshams a credit of $500,000 towards their debt. There remained the sum of $1,000,000 which was allocated to the three farms that had been purchased by the Banks for $330,000. In order to avoid showing a "profit" of $670,000 ($1,000,000 minus $330,000) and acting upon the advice of tax counsel, the Banks — on their own books — credited the Esham account with the "profit," thereby showing no gain for tax purposes on the resale of the farm property to Champion Chicken Products Corporation. The Eshams, however, were not given notice of the $670,000 credit, and apparently, the Banks never intended that the Eshams would actually receive the credit. A Statement of Account prepared by the Banks for trial did not include the $670,000 credit in computing the total amount of the Esham indebtedness.[4]

Not content with the conduct and outcome of the foreclosure sale, the Eshams filed numerous exceptions

---

4. It was not until the Banks' records were obtained during this litigation that the Eshams learned of the $670,000 bookkeeping entry.

thereto on January 5, 1976. Sixteen days later, the circuit court ratified the foreclosure sale of all properties except the St. Martins Farm which was individually owned by Otis and Elizabeth Esham; the court deferred a decision on the issue of the Eshams' personal liability. The parties subsequently entered into a stipulation on March 5, 1976 whereby the Eshams would permit ratification of the sale of the St. Martins Farm in exchange for the Banks' promise not to sell at foreclosure any of the remaining Esham properties until a final resolution had been reached on the Eshams' exceptions to the foreclosure. The Eshams did, however, waive their objection to the place of sale of the St. Martins Farm.

Based upon this stipulation, the Circuit Court for Wicomico County (Pollitt, J.) ratified the St. Martins Farm sale, but reserved for future hearing the issues raised in the exceptions "insofar as they relate to the personal obligations of the Eshams or the responsibility of any property owned by the Eshams individually for any part of this mortgage indebtedness, *except that those exceptions related to the jurisdiction of sale and the County in which said sales took place are overruled and not preserved for further hearing.*" (Emphasis added.)

On October 12, 1976, prior to the settlement of the case with the secured creditors or the final determination of the reserved exceptions, and notwithstanding the above stipulation, the Banks advertised a foreclosure sale of the Eshams' Home Farm.[5] When reminded of the stipulation, however, the Banks discontinued all attempts to sell the property.

As a result of the foregoing events, the Eshams instituted three actions — two in equity and one at law — against the Banks. As previously noted, exceptions to the foreclosure sale of December 5, 1975 were filed on January 5, 1976 in the Circuit Court for Wicomico County. Thereafter, on January 20, 1976, an action in equity was filed in the Circuit Court of

5. The Home Farm, the Pratt-Phillips Farm, and the St. Martins Farm had been sold, under a contract of sale dated January 5, 1975, by Otis and Elizabeth Esham to Rock Creek Farms, Inc., an Esham holding company. At the time of the attempted foreclosure, the title to the Home Farm was therefore vested in the corporation.

Baltimore City asking for injunctive and declaratory relief and ancillary damages with respect to activities surrounding the December 5, 1975 foreclosure sale. Finally, on July 7, 1977, the Eshams filed a suit at law in the Superior Court of Baltimore City claiming damages in connection with the attempted foreclosure sale of the Home Farm in October 1976. The Declaration was in two counts: Count I alleged a breach of contract stemming from a claimed violation of the March 1976 stipulation barring further foreclosures, and Count II, premised upon the identical facts, alleged slander of title. These actions were consolidated for trial in the Circuit Court for Wicomico County. All parties agreed that if a breach of contract or slander of title was found to have occurred, then the law action would be returned to the Superior Court of Baltimore City for a jury trial on the issue of damages.

In July 1978, trial was held before Judge James A. Perrott, Associate Judge of the Supreme Bench of Baltimore City, and Judge Richard M. Pollitt, Associate Judge of the Circuit Court for Wicomico County. At the close of the week-long trial, the consolidated cases were held *sub curia* to allow the filing of post-trial memoranda of law, and to give the court an opportunity to digest the massive amount of conflicting financial and accounting testimony that had been presented. After further oral argument, Judge Pollitt, speaking for himself and Judge Perrott, rendered an oral opinion.

The court's findings consisted of the following:

1) The Eshams were co-makers — not guarantors or sureties — of the notes securing the mortgages;

2) As to the notice given to the Eshams of the foreclosure sale of the corporate chattels, "Otis Esham was aware of the sale and participated we believe in the arrangements for it. There is no evidence that any specific notice of that sale was given to any of the individual Eshams or that any of them other than Mr. Otis Esham had actual notice of it";

3) Certain delays in conducting the foreclosure

sale of the real property were "excusable" and the sale was "well-conducted";

4) The price of $330,000 paid by the Banks for three processing plants was not such as to shock the conscience of the court;

5) The sale in Wicomico County of the St. Martins (Dr. Warren) Farm and the Snow Hill Processing Plant, both situated in Worcester County, was proper; and

6) The attempted sale of the Eshams' Home Farm was an understandable mistake and did not constitute a breach of contract; it was not maliciously motivated, and no damages were suffered as a result of the attempt.

The court eschewed the use of precise accounting methods in resolving the case because of the irreconcilability of the figures received in evidence. It did, however, make certain computations in reaching its decision. First, the court accepted as a starting point the Banks' most recent Statement of Account showing a balance due on the Eshams' account of $1,086,703.24. (The Statement of Account is reproduced in the Appendix.) From this figure the court deducted:

1) $275,000 representing the proceeds from the sale of the six corporate farms paid over to the Trustee in Bankruptcy;

2) $670,000 previously credited to the Esham account on the Banks ledgers representing the profit from the resale of the three foreclosed plants; and

3) $141,703.24 representing interest at 9% on $945,000 ($275,000 plus $670,000) for "the period of time between which those credits were made and subsequently withdrawn."

The total deductions then equalled the amount due; and the court therefore concluded that the mortgages had been satisfied and were no longer liens upon the Eshams' remaining property.

After evaluating all of the evidence, the court overruled the

Eshams' exceptions to the foreclosure sale, entered judgment for the Banks on the Eshams' claims for damages stemming from the sale and from the alleged breach of contract and slander of title, and ordered that the mortgages held by the Banks be discharged and that releases be executed. The essence of the court's ruling was contained in Judge Pollitt's final words from the bench: "The best we can make out of this whole mess is a Mexican standoff, and nobody owes nobody nothing."

Three days later, on September 11, 1978, the court filed a written Order setting out, in substance, the terms of its oral opinion. On September 14, 1978, the Banks filed a Petition for Rehearing premised upon an alleged mathematical error in the court's calculations. The petition was denied. The Banks noted an appeal to this Court, and the Eshams cross-appealed.

## II

We are met at the outset with a significant procedural issue raised by counsel for the Eshams at oral argument in an oral motion to strike the Banks' reply brief. Leave to file a written motion was granted by the Panel, and a "Motion to Strike Reply Brief and Argument Thereon and for Additional Relief" was promptly filed. The Banks interposed a written opposition to the motion.

In their motion to strike, the Eshams claim that the Banks' reply brief improperly challenged, for the first time on appeal, the $670,000 credit allowed to the Eshams by the trial court.[6]

---

6. As we previously stated, the $670,000 represented the "profit" to the Banks upon the resale to a third party of the three processing plants which had been purchased by the Banks at foreclosure. Since the Banks' own ledgers had credited the $670,000 toward the Eshams' account, the chancellors ruled that the "clean hands" doctrine prevented the Banks from withdrawing the credit for the purposes of this litigation. They stated:

"Now, the Court believes that the action of the bank in crediting $670,000.00 on their books to the Esham loan for the stated purpose of avoiding having to pay any income tax on it, whether they received the money or not, considering the old equitable maxim that he who seeks equity must do equity, the Court believes that under those circumstances, crediting that $670,000.00 and calling it the appraised value of the property, that once having done that, they are stuck with it.

We believe that the Eshams are entitled to that credit of $670,000.00."

It is their position that the Banks not only failed to contest the $670,000 credit in their original brief, but also that they expressly conceded the issue. The Banks, in opposition to the motion to strike, contend that they have always questioned the propriety of the $670,000 credit and that their reply brief was filed to "clarify the confusion created by the Eshams['] appellees' brief." They deny that the issue is newly raised in the reply brief. We have difficulty in accepting the Banks' position.

In the first place, the Banks' original brief presented one and only one issue under "Questions Presented":

"The Trial Court erred in analyzing certain financial data and testimony presented at trial, specifically by crediting to the Esham account *one* amount twice, thereby miscalculating, that, as of the date of trial nothing was due and owing from the Eshams on any of their loans to the FLB/PCA, *where in fact approximately $300,000.00 was still due.*" (Emphasis added.)

It is clear from this statement, that the Banks were claiming only $300,000, which represents the $275,000 credit plus miscellaneous costs.

Other portions of the Banks' original brief unequivocally indicated the essence of their claim on appeal. At one point, they stated:

"The lower Court in its analysis of the computations presented by the Appellant FLB/PCA, misconstrued or overlooked *one important figure,* thereby erroneously crediting to the Eshams *one* figure twice. *IT IS FROM THIS MATHEMATICAL ACCOUNTING ERROR THAT THE APPELLANT FLB/PCA APPEALS.*" (Emphasis added.)

Indeed, the very introduction to the argument presented in the Banks' original brief narrowly confined the issue presented:

"The Appellant's [sic] basis for appeal is relatively simple and straightforward. For purposes of our

456

argument, we will concede every single factual finding made by the lower Court including, but not limited to, every single finding of fact as it relates to the debt, the credits to the debt, the expenses of the sale, and the accounting practices of the Appellant. Giving benefit to all of the above, *THE LOWER COURT GAVE A DOUBLE CREDIT TO THE DEBT WHEN IT DID NOT INTEND TO DO SO.*" (Emphasis in the original.)

The Banks' original brief mentioned the $670,000 credit in setting out the lower court's calculations; it nowhere challenged the credit's legal basis.

In their reply brief the Banks claimed that the Eshams' appellees' brief discussed "several questions not raised by the FLB/PCAs which require a response...." Argument was then exclusively addressed to a two-pronged challenge to the $670,000 credit given to the Eshams by the trial court.[7] The Banks gave no indication of the manner in which the Eshams raised the issue in their appellees' brief.[8] Although the Banks' original brief claimed that the trial court erred by roughly $300,000, the reply brief claimed error of approximately $970,000. The reply brief stated:

---

[7]. As a factual issue, the Banks alleged that they never actually received the funds representing the credit, thereby making the credit improper. Further, they argued that Maryland law allowed them, as mortgagees, to keep any profits stemming from a resale of foreclosed property to a third party.

[8]. There is only one statement in the Eshams' appellees' brief that addresses the issue of the $670,000, and it indicates that the Eshams interpreted the Banks' original brief in the same manner as this Court now does. The Eshams stated:

"Even the Banks appear to accept the correctness of the trial court's holding that credits should be given for the $670,000 profit on the resale of the operating properties, the $275,000 given to the Trustee, and the interest thereon. The Banks say, though, that the court gave a 'double' credit...."

This passing reference to the $670,000 is not sufficient to make issue of the credit. Actually, it demonstrates the Eshams' reliance on the sole issue originally raised by the Banks: the Eshams' appellees' brief is devoted to refuting the Banks' theory of a double $275,000 credit. Indeed, it states: "The existence of the alleged 'double credit' *which is the sole basis for this appeal* is, likewise, the product of a logical absurdity." (Emphasis added.)

"For the foregoing reasons, the FLB/PCAs contend that the Lower Court was clearly erroneous in applying the sum of $670,000.00 to the Esham debt when in fact said sum was never received by the FLB/PCAs. Therefore, the aforesaid sum should be reapplied against the Eshams *together with the sums the FLB/PCAs argued were mistakingly double-credited in their prior briefs herein.*" (Emphasis added.)

The Eshams maintain that the $670,000 item first appeared on appeal in the reply brief, and they contend that the Banks must be confined to the issue presented in their original brief.

The Rules guiding appeals in this Court provide that the appellant's brief "*shall* contain" six separate sections, among which are:

"A brief statement of the case together with a *succinct statement of the questions presented separately numbered.* The statement of the questions presented *shall indicate the legal propositions involved* and the *questions of fact at issue* expressed in the terms and circumstances of the case without unnecessary detail.

* * *

Argument in support of the position of the appellant." (Emphasis added.)

Md. Rule 1031 (c) (2) & (5). These provisions are mandatory and, therefore, it is necessary for the appellant to present and argue all points of appeal in his initial brief. As we have indicated in the past, our function is not to scour the record for error once a party notes an appeal and files a brief. *von Lusch v. State,* 31 Md. App. 271, 281-282, 356 A.2d 277, 284-285 (1976), *rev'd on other grounds,* 279 Md. 255, 368 A.2d 468 (1977); *State Roads Commission v. Halle,* 228 Md. 24, 32, 178 A.2d 319, 325 (1972) (it is not incumbent upon the court to scan the record for error at the mere suggestion of a party).

In prior cases where a party initially raised an issue but then failed to provide supporting argument, this Court has

declined to consider the merits of the question so presented but not argued. *Kimbrough v. Giant Foods, Inc.,* 26 Md. App. 640, 654, 339 A.2d 688, 696-697 (1975); *GAI Audio of New York, Inc. v. Columbia Broadcasting System, Inc.,* 27 Md. App. 172, 182-183, 340 A.2d 736, 743-744 (1975); *Van Meter v. State,* 30 Md. App. 406, 407-408, 352 A.2d 850, 851-852 (1976); *see also Harmon v. State Roads Commission,* 242 Md. 24, 217 A.2d 513 (1965); *Ricker v. Abrams,* 263 Md. 509, 283 A.2d 583 (1971).

The Banks, in the instant case, not only omitted supporting argument on the issue of the $670,000 credit; but they failed even to raise the issue in their questions presented. This double omission is serious and constitutes a clear violation of the Rules.[9] It is the appellants' primary obligation under Rule 1031 to pinpoint the errors raised on appeal and to support their contentions with well-reasoned legal argument.

Maryland Rule 1030 (a) (3) permits an appellant to file a reply brief. The Rules do not prescribe the content of such a brief, nor are there any cases in this State which expand upon the Rule.[10] We have previously held that, while reply briefs are permitted under the Rules, there is no provision which permits the filing of supplemental, additional, or

---

9. In the instant case, the issue of the $670,000 credit was raised by the Banks in oral argument; however, that in and of itself does not place the issue before the court. Hyde v. State, 228 Md. 209, 218, 179 A.2d 421, 425 (1961), *cert. denied,* 372 U.S. 945 (1963); Jacober v. High Hill Realty, Inc., 22 Md. App. 115, 321 A.2d 838 (1974). Since the Eshams formally moved at the outset of their argument to dismiss the reply brief, the oral presentation of the issue was subject to our disposition of the motion to dismiss.

10. We note that the rules of appellate courts from other jurisdictions are similar to the provisions of the Maryland Rules. California simply provides that "[a]ny appellant may file an appellant's reply brief." Cal.Sup.App.Ct. R.14. Illinois requires that the reply brief "shall be confined strictly to replying to arguments presented in the brief of appellee...." Ill.S.Ct. R.341(g). Iowa and Vermont both permit a "brief in reply to the brief of appellee...." Iowa S.Ct. App.R.14(c) and Vt.R. App.P. 28(c). Washington requires that a reply brief "should be limited to a response to the issue in the brief to which a reply brief is directed." Wash.S.Ct. App.R.10.3(c). While the language employed in the various rules differs slightly, there is little difference in their substance. For this reason we consider, *infra,* the opinions of the appellate courts of those jurisdictions in assisting our construction of the Maryland Rules.

Both Illinois and Iowa have waiver provisions in their rules which require an appellant to state and argue an issue in his original brief to avoid a waiver of such issue. Ill.S.Ct. R. 341(e)(7) and Iowa S.Ct. App.R. 14(a)(3).

amended briefs. *Boone v. State,* 3 Md. App. 11, 257 A.2d 787, *cert. denied,* 393 U.S. 872 (1968).

The function of a reply brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue clearly each point of his appeal. We think that the reply brief must be limited to responding to the points and issues raised in the appellee's brief. This is the uniform view of other courts which have considered the issue. *See, e.g., Molnar v. City of Aurora,* 38 Ill. App. 3d 580, 348 N.E.2d 262, 264 (1968) ("The reply brief, if any, shall be strictly confined to reply to arguments presented in the brief of appellee...."). *See also St. Regis Paper Co. v. Hill,* 198 So. 2d 365 (Fla. Dist. Ct. App. 1967); *Wolfswinkel v. Gesink,* 180 N.W.2d 452 (Iowa 1970); *Horicon v. Langlois' Estate,* 115 Vt. 470, 66 A.2d 16 (1949); *Mead School Dist. No. 354 v. Mead Educ. Ass'n,* 85 Wash. 2d 278, 534 P.2d 561 (*en banc* 1975). To allow new issues or claims to be injected into the appeal by a reply brief would work a fundamental injustice upon the appellee, who would then have no opportunity to respond in writing to the new questions raised by the appellant. Due process requires that all parties have an opportunity to reply to new issues asserted against them, as the California Supreme Court has recognized in a similar context: "Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief of an appellant." *Varjabedian v. City of Madera,* 20 Cal. 3d 285, 295, n. 11, 142 Cal. Rptr. 429, 436, n. 11, 572 P.2d 43, 50, n. 11 (1977). *See also Ryall v. Waterworks Improvement Dist. No. 3,* 247 Ark. 739, 447 S.W.2d 341 (1969).

The reply brief must do what it purports to do: it must respond to the points raised in the appellee's brief which, in turn, are addressed to the issues originally raised by the appellant.

A fair reading of the briefs submitted by the Banks leads us to the inescapable conclusion that the "Reply Brief" was a reply brief in style only. Although it made a pretense of "replying" to issues raised by the Eshams' appellees' brief, the reply was illusory. The Eshams did no more in their brief than respond to the Banks' original argument concerning the double crediting of the $275,000.

We note that the Banks have made an effort to justify their reply brief by reference to a point that was raised in oral argument. Their opposition to the motion to strike contains this statement:

> "This Court clearly stated the FLB/PCA[']s position as explained in their briefs, both appellant and reply, when it stated that it was one member's opinion that the FLB/PCAs were seeking alternative forms of relief. *This brief synopsis of the FLB/PCA's position is one which they adopt and accept vehemently and one which has never changed from the outset in these proceedings.*" [11] (Emphasis added.)

If, by this statement, the Banks are suggesting that they are entitled to either the $670,000 or the $275,000, but not both, they are in conflict with their reply brief, where they clearly ask for both, not either.[12]

At all events in their *original* brief, for reasons known only to the Banks, they were content to raise only the $275,000

---

[11]. We have carefully reviewed the voluminous record in this case, and we are compelled to observe that the Banks had three opportunities prior to the reply brief to challenge the $670,000 credit and failed to do so. The Banks filed a Petition for Rehearing which, as we read it, was premised upon the alleged double accounting error involving the $275,000; essentially, the petition was a rudimentary form of the Banks' Appellants' Brief, which constituted their second opportunity to raise the issue of the $670,000 credit. The Banks, as Cross-Appellees, filed a brief in which they took occasion to amplify their discussion of the $275,000 credit by stating that deducting the $275,000 from the $670,000 would be "the correct way to account for the credits. . . ." On their fourth attempt (the reply brief), they finally disputed the $670,000 credit.

[12]. This inconsistency leads us to sympathize with the Eshams in observing that the Banks have been unable to determine exactly the amount of the debt. Prior to trial the Banks claimed $1,660,000 was still due, but this figure was orally adjusted to $1,300,000. At trial the Banks produced evidence that the debt was $1,086,000; however, immediately after trial in their Petition for Rehearing the Banks alleged that $1,391,557 (less $945,000 in deductions allowed by the court) was due. Moreover, the figures provided in their briefs have varied. The Banks' Appellants' Brief asked for an "amount somewhat in excess of $300,000.00," or in the alternative, $446,557.32. In their second brief, as cross-appellees, they argue for an "amount something in excess of $370,000.00;" however, they ask us to "enter judgment in favor of this Appellee in the amount of said error, approximately $300,000.00." Finally, in their reply brief they ask for the sum requested in the prior briefs plus $670,000.00.

credit as a point of appeal. They expressly, intentionally, and specifically decided to "concede every single factual finding" and to appeal only from an alleged, solitary mathematical error, involving only the $275,000. The Rules guiding appeals in this Court are clear. An appellant's brief must contain not only "Questions Presented," but must provide "[a]rgument in support of the position of the appellant." Md. Rule 1031 (c) (2) & (5). The Banks did not raise, nor argue, the $670,000 credit in their original brief; their failure to do so is fatal.

We shall therefore grant the Eshams' Motion to Strike the Reply Brief and Argument Thereon. The reply brief will not be considered and the Banks shall be confined in their appeal to the issue raised in their original brief, which includes only the challenge to the $275,000 credit.[13]

### III

We now turn to the issue presented by appellants' brief, wherein they state: "The Trial Court, in an attempt to account for every credit to which the Eshams were entitled, ... applied one credit twice, thereby giving the Eshams an extra $275,000.00 reduction of their debt." The $275,000 credit represented the amount paid by the Banks to the Trustee for the six farm properties sold at foreclosure pursuant to their agreement and charged as an expense of sale to the Eshams.

The court, in giving the credit stated:

"The Court also believes that the credit of $275,000.00 which was paid by the banks to the trustee without the consent of the Eshams, though not amounting to a release as such, was under the circumstances — and to this point at least the trustee agrees with the Eshams — and there again the bank at one time did credit it on their books, that the Eshams are also entitled to that credit of $275,000.00.

\* \* \*

---

**13.** Since the issue of the $670,000 credit is not properly before the Court, we do not consider it and express no view concerning the merits of the Banks' claim of error on this issue.

[W]e do not believe this $275,000.00 can be considered as an expense of sale, that that is not the kind of payment that is ordinarily contemplated by the expenses of sale."

At trial, Donna Core, one of appellants' accountants, testified as to the outstanding balance remaining on appellees' debt. A written statement of account that Ms. Core prepared was introduced. According to this statement, $1,086,703.24 was due on the loans. (The Statement of Account is reproduced in the Appendix.) It is apparent from the court's opinion that it accepted this figure as the outstanding debt. Neither party directly disputes this total, but only the credits to be deducted from it.

The Banks do not question the Eshams' entitlement to the $275,000. Their only complaint is that the amount had been previously deducted on Donna Core's statement of account in arriving at the $1,086,000 figure and, therefore, they allege that the trial court gave the Eshams a double credit when it subtracted $275,000 from the $1,086,000. To support their contention, they focus upon the sum of $365,145.92, captioned in the Statement of Account as "Net from Sale of Processing Plants, Hatchery." The Banks' version of the proper accounting method to be applied is explained in their cross-appellees' brief:

"The actual sum from funds derived from all sales applied to the Esham debts was $365,000.00 [14] which sum represented the $670,000.00 less $275,000.00 paid to the Trustee in Bankruptcy and other miscellaneous expenses including attorney's fees. . . .

The lower court, however, did not recognize that *the $275,000.00 payment to the Trustee in Bankruptcy had already been taken into consideration by reducing the $670,000.00 figure by said sum.* Thus, instead of crediting $365,145.92, plus $275,000.00 which was, in fact, the *correct way to*

---

14. This statement is incorrect. There were other sale proceeds received by the Banks. *See* n. 15, *infra.*

*account for credits,* the court credited the full $670,000.00 plus an additional $275,000.00. It is this double credit which the Appellant, FLB/PCAs, submit should not have been done." (Emphasis added.)

We agree that the $275,000 was "taken into consideration" in computing the $365,145.92 credit. We disagree, however, that this computation resulted in a $275,000 credit to the Eshams' account. In fact, it was *debited:* the Banks reduced the $670,000 credit by $275,000 plus assorted expenses. In order to give the Eshams an *actual positive* credit for the $275,000, it was first necessary that the $275,000 be added to the $365,145.92, thereby correcting the erroneous $275,000 debit. Then, of course, the $275,000 had to be credited. It is this last transaction that gave the Eshams an actual and positive credit. The testimony and admitted evidence unequivocally supports this conclusion.

We note that the $275,000 did not comprise part of the proceeds from the sale of the processing plants; it came from funds produced by the sale of the six farm properties.[15] It had no connection with the sale of the processing plants and should never have been deducted directly from the $670,000 profit realized on the sale of those plants. The $275,000 and the $670,000 represented portions of the sale proceeds from separate and distinct properties, and the trial court was correct in separately treating them. Accordingly, we hold that the court was not in error in allowing the $275,000 credit.

IV

On their cross-appeal, the Eshams first contend that the trial court was in error when it declined to hold that the Banks' foreclosure advertisement of the Eshams' home farm constituted a breach of contract. In March 1976, the parties had agreed that no individually held prop-

---

**15.** The $670,000 "profit" was produced by contracting for the sale of the three processing plants to Champion Chicken Products Corporation several months after the December 5, 1975 foreclosure sale. The funds for the $275,000 payment to the Trustee were produced by the sale of the six farms at foreclosure on December 5, 1975.

erty would be foreclosed unless certain conditions had been met. These conditions had not been satisfied at the time of the advertisement in November 1976. We concur with the lower court's conclusion that the attempted sale was an innocent mistake which the Banks immediately rectified when they became aware of their oversight. Neither side has cited any authority, and we have found none, which supports the proposition that merely initiating and advertising a foreclosure sale amounts to a breach of an agreement not to sell. The chancellors also ruled that the Eshams had shown no damages attributable to the attempted sale. We are unable to find their conclusions "clearly erroneous." Md. Rule 1086.

## V

When the Eshams' primary corporate entity, Maryland Chicken Processors, Inc., entered bankruptcy proceedings, an automatic stay was imposed on all court proceedings seeking to enforce liens against the bankrupt; title to *all* of the bankrupt's property vested in the Trustee and was placed in the custody of the bankruptcy court. *Isaacs v. Hobbs Tie & Timber Co.,* 282 U.S. 734 (1931).[16] Although the stay prevented the Banks from initiating a foreclosure sale, Federal Rule of Bankruptcy Procedure 601 (c) permitted the Banks to file a complaint seeking to have the stay removed. The Banks filed such a complaint, claiming that there was no equity in the secured property for the general nonsecured creditors of the bankrupt. In early 1975, the case was argued before the bankruptcy court, but prior to a decision by that court, the Trustee and the Banks were able to reach an agreement whereby the stay would be released, the secured properties would be sold at foreclosure, and the Trustee

---

16. The Federal Rules of Bankruptcy Procedure provide that the automatic stay operates against "any act or the commencement or continuation of any court proceeding to enforce: (1) a lien against property in the custody of the bankruptcy court, or (2) a lien against the property of the bankrupt obtained within 4 months before bankruptcy by attachment, judgment, levy, or other legal or equitable process of proceedings." Rule 601 (a).

would receive the proceeds from the sale of six corporate farms. On October 23, 1975, the bankruptcy court, in a written Order, approved this agreement holding that it was "satisfied that the implementation of that agreement is in the best interest of the Bankrupt, the Trustee, the secured creditors and general creditors in this proceeding. . . ."

The Eshams argue that this agreement, made without their knowledge or consent, released them from liability as a matter of law. Relying upon commercial law principles, they claim that regardless of whether they are classified as co-makers or guarantors, the agreement between the Banks and Maryland Chicken Processors, Inc. — represented by the Trustee — was an unauthorized release that impaired the Eshams' rights of subrogation and contribution. According to the Eshams, the agreement discharged all of Maryland Chicken Processors, Inc.'s liability as a co-debtor and "a release of one co-principal will release another principal or his surety."

Under Maryland law, the intent of the parties to the instrument of release dictates the interpretation to be given to the instrument as well as its scope and effect. *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 141 A. 434 (1928). *See also Roe v. Citizens National Bank,* 32 Md. App. 1, 358 A.2d 267 (1976); *Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 204 A.2d 537 (1964). If the creditor clearly manifests in the release instrument an intention to reserve its rights against the remaining obligors, then that intention will be given effect by the courts.

The agreement that was entered into between the Banks and the Trustee provided:

> "If said net proceeds to Land Bank/PCA shall be insufficient to pay said debt and related expenses to Land Bank/PCA, it is understood that Land Bank/PCA, as hereinabove provided in Paragraph 5 hereof, nevertheless, shall release all claims *(except only its claim, if any, as a general creditor in the event of a deficiency)* against the Trustee or the assets of Bankrupt, but *shall be free to proceed*

*against any other assets of Esham or any other parties (excluding Bankrupt) indebted to Land Bank/PCA under said deeds of trusts and financing statements."* (Emphasis added.)

We believe this provision can be given only one reasonable construction: the Banks reserved both their right to proceed against the Eshams individually and their right to collect a deficiency judgment as a general creditor of Maryland Chicken Processors, Inc. In light of the clearly expressed intention of the parties, we think that the Eshams' protestations must fail.

## VI

At the trial below and on appeal, the Eshams have sought to have the foreclosure sale of the three processing plants set aside. They claim that the Banks' purchase of the properties at foreclosure for $330,000 in conjunction with the subsequent sale of those properties for $1,000,000 and the properties' appraised value in excess of $1,000,000 should "shock the conscience" of the Court.

It is a well established principle that a sale of property at a foreclosure sale will not be set aside in Maryland unless the price was "so inadequate as to shock the conscience of the Court." *Waring v. Guy,* 248 Md. 544, 549, 237 A.2d 763, 766 (1968). The mere inadequacy of price is not sufficient. *Id.; see also Garland v. Hill,* 277 Md. 710, 712, 357 A.2d 374, 375 (1976). The factors that are to be considered by the finder of fact regarding the propriety of a foreclosure sale are set out in *Lewis v. Beale,* 162 Md. 18, 158 A. 354 (1932). In carefully reviewing the instant circumstances, we have applied the factors set forth in *Lewis.*

The prices obtained for property sold at foreclosure are usually incommensurate with the appraised "market value" of the property. A private sale of the property, eight months later and at three times the purchase price, does not signify to us that the initial price was grossly inadequate. Furthermore, other factors, such as the inclusion of the Delaware feed mill in the subsequent sales package, may well

have made the original properties more attractive to a potential investor.

The court below found that the sale was "well advertised, well attended, and apparently at least properly conducted." Further, the court ruled that the $330,000 purchase price "under all of the circumstances does not shock the conscience of the Court." We are unable to find that decision "clearly erroneous." Md. Rule 1086.

## VII

After the foreclosure sale, the Eshams, citing Md. Rule W74 (b), excepted to the sale in Wicomico County of the St. Martins Farm and Snow Hill Processing Plant which were both located in Worcester County. The exception to the St. Martins Farm sale, however, was explicitly waived by the Eshams in their March 5, 1976 stipulation which the court subsequently incorporated in its decree ratifying the sale. Since the two Worcester County properties were simultaneously sold at the Wicomico County sale, we believe the express waiver of the objection to the place of sale of the St. Martins Farm operated to waive any similar objection to the Snow Hill Processing Plant sale.

Assuming, however, that the exception to the place of sale of the Snow Hill Processing Plant has not been waived, it is our opinion that the Eshams' argument premised on Md. Rule W74 (b) is without merit. That Rule provides:

"A mortgage sale shall be made in the county in which the mortgaged property is located. Where mortgaged property is located in more than one county, the sale may be made in any county in which part of the property is located."

It is the Eshams' position that the Rule should be narrowly construed to apply only when one parcel of realty lies in more than one county. The Banks contend that the Rule should be broadly construed to permit the foreclosure sale in one county of noncontiguous property located in more than one county

under circumstances such as those existing in the present case.

We believe that a construction given to a similar statutory provision by the Court of Appeals is both helpful and persuasive. In *Roessner v. Mitchell,* 122 Md. 460, 89 A. 722 (1914), the Court was asked to interpret the following portions of Section 87 of Article 16 of the Code of 1912:

> " '[I]f the lands lie partly in one county and partly in another, or partly in one county and partly in the city of Baltimore, then such proceedings may be commenced in either county or in the city of Baltimore,' and 'that Court shall have jurisdiction in which proceedings shall have been first commenced.' "

*Id.* at 463, 89 A. at 723.

In interpreting this provision, the Court stated:

> "We do not construe this language as it is construed by the appellants to apply only in those cases where the lands situated in the different counties are contiguous and together form one tract or parcel of land. The language used should be given a wider and more comprehensive meaning. The purpose of the statute was to avoid a multiplicity of suits and the costs and expenses of such suits. If the appellant's construction is to be placed upon the statute, it would apply only to a very small number of cases. In the great number of cases, where the lands in the different counties form separate and distinct tracts, proceedings would have to be instituted in each county in which the land is situated, which would be attended with much cost and expense. This we think was not the intention of the Legislature as expressed by the statute. In our opinion, the meaning of the language of the statute is, that if all the lands to be affected by the suit are not situated in one county or in the City of Baltimore, but some of them are in one county and some in one

or more of the other counties, or some in the City of
Baltimore and some in one or more of the counties,
then such proceedings may be commenced in either
county, or in the City of Baltimore, where any part
of said land is situated, and the Court in which the
proceedings shall have been first commenced shall
have jurisdiction as to all of said lands, without
regard to the fact that such lands are contiguous and
form one tract or parcel of land."

*Id.* at 463-464, 89 A. at 723. This reasoning applies with like
force to the provisions of Rule W74 (b).

Appellants seek to distinguish *Roessner* by stating: "the
question is not how jurisdiction should have been obtained,
or the proceeding commenced, but *where the property should
have been sold.*" (Emphasis in the original.) Their reliance on
*Webb v. Haeffer,* 53 Md. 187 (1880), in this regard is
misplaced. *Webb* involved the mortgagee's sale in Baltimore
City of property located solely within Baltimore County
pursuant to a provision of the mortgage. The Court held that
the sale, which was not by foreclosure, but more in the nature
of a sale by assent, could not occur in a jurisdiction other than
where the property was located, unless the property was
situated in several jurisdictions. *Id.* at 190. *See also Ahrens
v. Ijams,* 158 Md. 412, 148 A. 816 (1930). *Webb,* which dealt
with a single parcel wholly situated within one jurisdiction,
provides no guidance under the current Rule and the instant
facts. We believe the broader construction of Rule W74
(b), is the better one and in keeping with the intent
of the Rule to avoid needlessly complicated and un-
necessary foreclosure sales. As in the present case,
where multiple mortgages are secured by multiple par-
cels of property constituting one integrated business
operation, the foreclosure sale of all of the property
in one jurisdiction is proper under Md. Rule W74 (b).

## VIII

On November 20, 21, and 22, 1975, the Banks conducted a
sale of numerous chattels owned by the Eshams' corporate

entities. This sale was advertised on November 10 and 19 in a local newspaper. Otis Esham had personal, advance knowledge of the sale, but the record is unclear as to when the other Eshams became aware of the sale. It is their position now that the failure to provide them with notice discharged them from liability. Furthermore, they argue that this discharge of the co-debtors, who were sureties to Otis Esham, also served to discharge the latter.

Because this issue has not been preserved for appellate review, we need not address its merits. We must reach this conclusion for no exceptions to this sale were filed. The chattel sale was ratified and became final on December 19, 1975; a supplemental report of sale was ratified on January 22, 1976. As stated in *Bachrach v. Washington United Cooperative, Inc.:*

> "[T]he law is firmly established in Maryland that the final ratification of the sale of property in foreclosure proceedings in res judicata as to the validity of such sale, except in case of fraud or illegality, and hence its regularity cannot be attacked in collateral proceedings."

181 Md. 315, 320, 29 A.2d 822, 825 (1943). Relying on *Bachrach,* we hold that the Eshams' failure to file timely exceptions to the chattel sale bar them from thereafter, directly or collaterally, attacking the sale on the basis of alleged violations of a notice requirement.

*Judgment affirmed; one-half of the costs to be paid by the appellants, and one-half of the costs to be paid by the cross-appellants.*

# APPENDIX
## STATEMENT OF ACCOUNT
## MARYLAND CHICKEN PROCESSORS — ESHAM
## JULY 17, 1978