640 A.2d 236

**William S. BECK et al.**

v.

**Roger N. MANGELS et al.**

**No. 1222, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

April 28, 1994.

146

Elise Davis, Chestertown, for appellants.

R. Stewart Barroll (Hoon & Barroll, Chestertown, Robert R. Kern, Jr. and Gallagher, Evelius & Jones, Baltimore, on the brief), for appellees.

Argued before BLOOM, CATHELL and MURPHY, JJ.

CATHELL, Judge.

■ Appellees, Roger N. Mangels and Alice B. Mangels (Mangels), filed a complaint for declaratory relief in the Circuit Court for Kent County, asking the court to declare that, as dominant tenants, they possessed an easement over and through the property of the servient tenants, appellants, William S. Beck and Pauline G. Hand [1] (Beck). The trial court found that an easement of necessity had been created in 1931, that it was not extinguished by a subsequent conveyance of additional property to Mangels's predecessor in title, that the parties had consented by acquiescence to a relocation of the way in 1948, and that the present right-of-way should be a total of fifteen feet in width. Appellant poses eleven questions in the form that follows:

1. Will this Appellate Court overturn at least 125 years of law in this State concerning easements by necessity by affirming the trial court's decision?

2. Was it reversible error for the trial court to utilize criteria applicable to prescriptive easements rather than easements by necessity in this case, if in fact an easement by necessity existed?

---

[1]. Pauline G. Hand died on February 23, 1933. Pauline H. Hess, Dorothy Griffin, and Ruth Shivery are the co-personal representatives of her estate. We shall generally refer to all the appellants as "Beck."

3. Was it reversible error for the trial court to enlarge an undisputed eight (8) foot wide road to a greater width?

4. Was it reversible error for the trial court to permit the Appellees to place macadam or concrete along the road when it had never been so improved in the past?

5. Was it reversible error for the trial court to provide for a road that would permit vehicles larger than those in existence in 1931 to service Appellees' property?

6. Was it reversible error for the trial court to not make findings of fact as to what permission, if any, was given to the Appellees by the Appellants; whether the Appellee stated to the witnesses Shivery and Wilson at the time of the sale that the Appellee knew he had no right of way, except by permission; and whether or not the witnesses, Bramble and Shivery, heard the Appellee request permission to use the said lane shortly after the sale?

7. Was it reversible error for the trial court to fail to state the evidence it relied on in rendering the opinion as to the size of the trees in 1931?

8. Was it reversible error for the trial court to fail to interpret the meaning of the language in the second 1931 deed "extending from the land of Martenet to the public road"?

9. Was it reversible error for the trial court to fail to state the evidence it relied on in determining that Martenet began using the Beck lane in 1947/48, particularly in light of the testimony of Bramble, Beck, Shivery and Wilson?

10. Was it reversible error for the trial court to fail to state the evidence the court relied on in making a finding that Beck and Hand agreed to transfer the servitude from the Bramble property to the Beck/Hand property and when it occurred?

11. Was it reversible error for the trial court to fail to state what evidence it relied on in determining that the "construction of a road would have been extremely expensive in 1931"?

With respect to questions 6, 7, 9, 10, and 11, Beck objects to what he perceives to be the trial court's failure to state in its opinion the evidence it relied on to support its findings, not that the findings are wrong. In question 8, Beck asks whether it was reversible error for the trial court to "fail to interpret" certain language when it rendered its opinion. Neither in his brief, nor at oral argument, did Beck offer any substantial argument supporting his position on these specific questions. Md.Rule 8–504(a)(5) requires a party to present "argument in support of the party's position." *See also Bond v. NIBCO, Inc.*, 96 Md.App. 127, 137, 623 A.2d 731 (1993); *Monumental Life Ins. Co. v. United States Fidelity and Guar. Co.*, 94 Md.App. 505, 544, 617 A.2d 1163, *cert. denied,* 330 Md. 319, 624 A.2d 491 (1993); *Holiday Universal Club, Inc. v. Montgomery County,* 67 Md.App. 568, 570 n. 1, 508 A.2d 991, *cert. denied,* 307 Md. 260, 513 A.2d 314, *appeal dismissed,* 479 U.S. 1049, 107 S.Ct. 920, 93 L.Ed.2d 973 (1986), and *Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 457, 406 A.2d 928 (1979), where we said that the above "provisions are mandatory and, therefore, it is necessary for the appellant to present *and argue* all points of appeal in his initial brief. . . . [O]ur function is not to scour the record for error once a party notes an appeal and files a brief." (Emphasis added.) We further commented, "In prior cases where a party initially raised an issue but then failed to provide supporting argument, this Court has declined to consider the merits of the question so presented but not argued." *Esham,* 43 Md.App. at 457–58, 406 A.2d 928.

Accordingly, we shall not directly address the questions discussed above. We do note that many of the questions may be answered as we address those issues that were properly presented by appellants.

◼ Likewise, we shall not respond to question 1, as it is an inappropriate question. Our function is to address the actions of the trial court in order to determine whether it erred. Should we err, the question can be presented to higher authority. We are thus left with four questions—2, 3, 4, and 5—to resolve directly. In order to address these questions, it

is necessary to determine whether the trial court correctly found that a way by necessity existed in the first instance. We shall first discuss those facts we deem necessary to resolve the issues.

## The Relevant Facts

In 1931, when both the dominant and servient estates in the case at bar were in unity of title, a common title predecessor to both appellants and appellees, Gale, conveyed from his tract of land formerly known as Gresham College a tract to appellees' predecessor in title, the Martenets. At that time, there was no explicit easement of access from the Martenet parcel over the remaining Gale parcel to the public road (Tolchester Road). The Martenets then used a way across a portion of the Gale land, in a northerly direction sometimes referred to by the trial court as the Martenet Branch,[2] to a road on the remaining Gale parcel referred to as "Gale lane" and then over "Gale lane" to access the public road.

Several months later, Gale conveyed to the Martenets a thirty foot wide strip of land along the irregular southern or western boundary of the original tract, running from the property originally conveyed to the public road. This second conveyance occurred on December 24, 1931. At the time of this second conveyance, no mention was made of the Martenets' rights concerning the use of the Martenet Extension and Gale lane. The thirty foot strip has never been improved and apparently during the time relevant to this case has been overgrown in a forest. It is composed in substantial part of wetlands.

In November of 1937, Gale conveyed a large tract of land to William A. Beck. The northerly property line of this Beck tract was parallel with and ten feet distant from the center line of Gale lane. This tract ran from the public road to the bay and separated the Martenet property along the Marten-

---

2. Generally, in this region of the state "branch" refers to an extension of a waterway. We thus shall hereafter refer to this roadway as an "extension" rather than a "branch."

ets' northerly property line from Gale lane and the balance of the Gale property. As to the Martenet Extension, if it was a way of necessity, the Beck tract was, even then, the servient estate with the Martenet tract being the dominant estate.

The remainder of the Gale property lying north of the Beck off-conveyance was conveyed to others and subsequently to David Bramble and is now called the Bramble tract. The present suit by the Mangelses (the Martenets' successors in title) does not claim any easement over the Bramble tract. Accordingly, we shall only address that tract from time to time as necessary.

Around 1948, Bramble's predecessor, Campbell, noticed that Gale lane was deteriorating. At that point, both Campbell and Beck were successors to the original servient estate. Gale lane was on the Campbell/Bramble property, and abutting the Beck property. Because Gale lane had deteriorated, Mr. Beck had a lane constructed abutting on his northerly property line and Gale lane. It was approximately fifteen feet south of the center line of Gale lane.[3] It was referred to below as the "Beck lane." We attach to our opinion as our Exhibit A a not to scale drawing of the locations of the various tracts indicating the approximate position of the various property lines, lanes, strips, and ways. We have prepared it from several exhibits attached to the trial court's opinion.

After Beck lane was constructed, the Martenets began to use it for ingress and egress to their property. When the Mangelses inspected the property prior to its purchase in 1963, they utilized the Beck lane. The Mangelses have continued to use Beck lane and have incurred expenses in maintaining both the Martenet Extension and Beck lane since.

We shall address other relevant facts as we address the issues necessary to resolve this appeal.

---

3. The trial judge in his opinion referred to it as fifteen feet southerly of the center line of Gale lane. As we are holding that the way has been relocated, the exact location of the center line of Gale lane is of no importance in our decision.

*Declaratory Relief*

In an action properly brought under the Declaratory Judgments Act, the court ordinarily must declare the rights of the parties in light of the issues raised. *Jennings v. Gov't Employees Ins. Co.*, 302 Md. 352, 355, 488 A.2d 166 (1985). In *Robert T. Foley Co. v. Washington Suburban Sanitary Comm'n*, 283 Md. 140, 155, 389 A.2d 350 (1978), a case in which the trial court failed to declare whether certain resolutions were valid, the Court of Appeals, quoting from its earlier case of *Dart Drug Corp. v. Hechinger Co.*, 272 Md. 15, 29, 320 A.2d 266 (1974), stated:

"While a declaratory decree need not be in any particular form, it must pass upon and adjudicate the issues raised in the proceeding, to the end that the rights of the parties are clearly delineated and the controversy terminated."

*See also Donnelly Advertising Corp. v. Mayor and City Council*, 279 Md. 660, 672, 370 A.2d 1127 (1977). In the case *sub judice*, the plaintiffs (appellees here) prayed:

1. That the Plaintiffs be granted a Declaratory Judgment determining that Plaintiffs and their successors in title and interest have an easement appurtenant to their property over and through the property of the Defendants.

We presume that appellants responded by asking the court not to make that declaration.[4] Judge Price, in an extensive, well-reasoned opinion, found certain facts and declared certain rights. We include here those we deem pertinent to our decision.

The Martenet/Mangels property adjoined the Chesapeake Bay, but it did not touch any public road. The deed by which the property was conveyed contained no express grant of easement for ingress and egress.

The parties agree that an easement by necessity was thus created on August 31, 1931 over a portion of the remaining

---

4. The index to the extract and appendix does not indicate that appellants' answer is included therein. We have not found it there. In any event, we presume they opposed the declaration below.

lands of Gresham College to allow ingress and egress to and from the Martenet/Mangels property.... [5] The Martenets therefore accessed their property by travelling in a westerly direction up the farm lane which serviced the Gale farm house, hereinafter referred to as the "Gale lane," to a point approximately 800 feet from the Chesapeake Bay. They then created a new lane in a southerly direction to their property, hereinafter referred to as the "Martenet branch." [We refer to it as the Martenet Extension.]

On December 24, 1931, almost four months after the initial conveyance to the Martenets, J. Page Gale conveyed to the Martenets, from his remaining acreage, a strip of land 30 feet in width, parallel with, contiguous to, and north of the division line between Hinchingham Farm and Gresham College, extending from the Martenet/Mangels property to Maryland Route 445.... This 30 foot wide strip is over a mile long and consists of 3.497 acres, more or less, most of which was, and still is, forest. There is no evidence that there has ever been an attempt to use this strip as an access road to the Martenet/Mangels property....

. . . .

In approximately 1948, due, in part, to the poor condition of the Gale lane, William M. Beck had a lane constructed on the Beck property. This lane, hereinafter referred to as the "Beck lane" was parallel to and approximately 15 feet South of the Gale lane. The Beck lane began at Maryland Route 445 and continued in a Westerly direction, intersecting the Martenet branch and terminating at the Beck homesite close to the shore of the Chesapeake Bay....

. . . .

Subsequent to the construction of the Beck lane, it being a newly constructed lane, and the Gale lane being in disrepair, the Martenets began to use the Beck lane for ingress and egress to their property....

---

**5.** In the issues presented in their brief and during oral argument, appellants indicated that they had not necessarily so agreed. We shall, accordingly, address this issue.

Since their purchase of the Martenet/Mangels property in 1963, Plaintiffs have used the Martenet branch and the Beck lane as their sole means of ingress and egress. Plaintiffs have borne the expense of maintaining the Martenet branch and the Beck lane during the time they have used them. The plaintiffs have used the property for residential purposes and for some agriculture and hunting.

Defendants, and their predecessors in title since the conveyance [to them] on November 27, 1937, have acquiesced to Plaintiffs (and Plaintiffs' predecessors in title) use of the Martenet branch and Beck lane. Plaintiffs' use and maintenance of this right of way has been with the intention to use the right of way for ingress and egress, but to not interfere with Defendants['] fee simple ownership and use of same.

The aforementioned 30 foot wide strip of land which extends from the Martenet/Mangels property to Maryland Route 445 contains extensive areas of nontidal wetlands and large trees. As can be seen from the plats appended hereto and from the deed description, the first two changes in course for this 30 foot wide strip after leaving Maryland Route 445, shown as "A" and "B" on Plat No. 4 appended hereto, contain acute angles. [We have incorporated the relevant portions of the trial court's plats in our exhibit.] While there is no evidence as to the exact size of the trees or timber on the 30 foot wide strip in 1931, one can infer that the strip was woodland then and the nontidal wetlands existed then as they do today.

Due to the relative narrowness of the 30 foot wide strip, the aforementioned acute angles ("A" and "B"), its topography, the "bogs" located therein and the necessary clearing and grubbing operation required for the construction of any new lane thereon, the construction of a lane in 1931, or any time thereafter, would have been extremely expensive. Construction of a lane over this strip today would cost between $200,000.00 and $345,000.00, assuming, arguendo, all wetlands and critical areas permits could be secured.

The present fair market value of Plaintiffs' property (with proper access) is approximately $675,000.00.

If a roadway or lane could have or could now physically be constructed within the 30 foot wide strip, its shape, width and the aforementioned acute angles, would have and would still limit its use to smaller vehicles. Even in 1931, any longer wheel-based truck such as a moving van, would have been unable to negotiate the curves which would have resulted from the aforementioned two acute angles. Not all fire apparatus would have been able to negotiate the resultant curves in 1931 or thereafter. Modern fire trucks are now wider and longer than those of 1931, modern moving vans are wider and longer than those of 1931 and modern ambulances are wider and longer than those of 1931. Many of these vehicles would now be unable to negotiate a lane constructed only on the aforementioned 30 foot wide strip.

The trial court then found that the parties had conceded that an easement of necessity was originally created in 1931. As we have said, there is some question as to whether such a concession was made. In any event, the finding stated by the trial court indicates that it found that an easement of necessity had been created. We agree. The law we shall hereafter refer to dictates that result. The court in its opinion then addressed whether the way of necessity had been terminated, concluding:

To determine whether the easement by necessity has been extinguished, we must look at the facts from December 24, 1931 to the present day.

This Court concludes that the conveyance of the thirty foot wide strip on December 24, 1931 from J. Page Gale to the Martenets was insufficient by itself to extinguish the existing easement by necessity. Due to the relative narrowness of the thirty foot wide strip at the acute angles ("A" and "B" as shown on Plat No. 4 appended hereto), its topography, and the "bogs" located therein, the thirty foot wide strip has never been a suitable means of access to the Martenet/Mangels property. It would be unreasonable to conclude that the thirty foot wide strip was intended to be

the means of access to the public highway when its utilization (were a lane to have been built on it) would preclude access by many vehicles, especially fire and emergency vehicles. This was true in 1931 and has remained the case until today.

Therefore the Court concludes that even if a lane could have been constructed within the thirty foot wide strip at a reasonable expense not out of portion to the value of the land of the Martenet/Mangels property, that said lane would not provide reasonable access to allow full utilization of the land of the Martenet/Mangels property. Reasonable access would be that access required for the dominant estate to make full utilization of its land. . . .

The Court also concludes that even if an inferior lane or access were constructed it could not have been, nor could it now be, constructed without unreasonable expense out of proportion to the value of the land of the Martenet/Mangels property. Due to the relative narrowness of the thirty foot wide strip, the aforementioned acute angles ("A" and "B"), its topography, the "bogs" located therein and the necessary clearing and grubbing operation required for the construction of any new lane thereon, the construction of a lane in 1931, or any time thereafter would have been a vast undertaking and would have required unreasonable expense out of proportion to the value of the land of the Martenet/Mangels property.

Therefore, the easement by necessity created on August 31, 1931 over a portion of the remaining lands of Gresham College has never been extinguished.

The court then addressed the location and relation of the easement.

C. Having determined that an easement by necessity exists in favor of the Martenet/Mangles property, what is the *present* location of such easement?

At the time of the creation of the easement by necessity on August 31, 1931, the Martenet/Mangels property became the dominant estate and the remainder of Gresham College

became the servient estate. That relationship has continued to today. The subsequent purchase of the Beck property by William M. Beck, on November 27, 1937, did not change the servient nature of that property. The Bramble property (the Brambles are not joined herein) and the Beck property together comprise the servient estate created on August 31, 1931.

Upon the facts of this case it is clear that the owners of both the dominant and servient estates acquiesced in the change of location of a portion of the original easement by necessity from the Gale lane to the Beck lane. The location of that portion of the easement over the Martenet branch [Extension] has never changed. The Court concludes that the owners of the dominant and servient estates consented by their acquiescence to a change in the location of a portion of the easement by necessity from the Gale lane to the Beck lane. The Court finds as a fact that this was a slight change in the location of a portion of the easement, that both the owners of the dominant and servient estates consented to this change and that the change does not invalidate the rights of the persons who are entitled to use the way. [Citation omitted, emphasis added.]

The court then declared that the appellees had a fifteen foot wide easement by necessity, extending 7.5 feet from the center line on each side over the Beck lane and Martenet Extension, and that the appellees also had the non-exclusive right to maintain and repair the easement including the right to maintain drainage, install utility facilities serving their property, and to surface and pave a twelve foot wide portion of the fifteen foot way. The court limited the use of the way to ingress, egress for "residential purposes, utilities, . . . fishing, farming and hunting."

The trial court made extensive findings (many of which are included here) and made a declaration that passed upon and adjudicated the issues raised, thus declaring the rights of the parties. We now must determine if it did so correctly. In order to so determine, we must acknowledge the law relating to: (1) easements (ways) of necessity; (2) termination of ways

of necessity; (3) relocation of ways of necessity; and (4) the increase in the scope and extent of ways of necessity.

## 1.

### Easements (Ways) of Necessity

■ In a case involving a dispute over the use of two dirt roads over contiguous parcels, the Court of Appeals first noted that a quasi-easement can arise when one owner of two parts of the same property has used one part for the benefit of the other in such a fashion that, if the two parts had been owned by different parties, a presumption of easement could exist. *Dalton v. Real Estate and Improvement Co.*, 201 Md. 34, 92 A.2d 585 (1952). The Court of Appeals then stated:

[T]he doctrine of *quasi*-easements has been extended to include established ways where they are reasonably necessary to the enjoyment of the property conveyed....

. . . .

A distinction has been maintained in the law between implied grants and implied reservations. If an easement is ... necessary to the reasonable enjoyment of the premises granted, it will be implied that the grant included the easement. However, if a grantor intends to reserve any rights ... he must reserve them expressly, and the only exception is of easements, including ways, of actual, strict necessity....

If, however, there is a simultaneous conveyance ... of both the serviently and dominantly used parts of land, the more liberal implied grant rule applies and not the more strict implied reservation test.

*Id.* at 46–47, 92 A.2d 585. *See also Zimmerman v. Summers*, 24 Md.App. 100, 114, 330 A.2d 722 (1975) (quoting *Oliver v. Hook*, 47 Md. 301, 310 (1877)). The Court of Appeals in *Shpak v. Oletsky*, 280 Md. 355, 360–61, 373 A.2d 1234 (1977), though primarily concerned with a *reserved* way of necessity, noted:

Judge Charles C. Marbury observed for the Court in *Hancock v. Henderson*, 236 Md. 98, 102, 202 A.2d 599

(1964), "Ways by necessity are a special class of implied grants and have been recognized in this State for a good many years." There are two types of ways of necessity, implied reservation and implied grant. . . .

"[G]rants of easements by implication are looked upon with jealousy and are construed with strictness by the courts." "The rule with respect to implied reservations is much more strict than that with respect to implied grants." [Citations omitted.]

*See also Mitchell v. Seipel,* 53 Md. 251 (1880), one of the earliest cases that discussed the distinction between reservations and grants. Speaking first of an early English case, the Court of Appeals opined:

[T]he Court of Exchequer . . . practically denied the existence in such cases of any distinction between an implied grant and an implied reservation. . . . But this case soon gave rise to controversy.

*Id.* at 266. The Court of Appeals held in a later case:

There has been some confusion in some of the cases because they have not distinguished between *implied grants* of easements and *implied reservations.* . . . The reason for sustaining implied grants is apparent as "a grantor shall not derogate from his grant," and when he intends to limit, restrict or burden the use of property conveyed . . . for the benefit of property retained, he should express his intention in language that is not easily misunderstood.

*Eliason v. Grove,* 85 Md. 215, 225, 36 A. 844 (1897) (citations omitted). *See also Slear v. Jankiewicz,* 189 Md. 18, 24, 54 A.2d 137 (1947), *cert. denied,* 333 U.S. 827, 68 S.Ct. 453, 92 L.Ed. 1112 (1948).

Authorities elsewhere are in general concurrence. In *George v. Phillips,* 642 S.W.2d 275 (Tex.1982), the Court of Appeals of Texas clarified the distinction:

The final point of error urges that the trial judge erred in using the standard of reasonable necessity rather than the standard of strict necessity in instructing the jury on the theory of right-of-way by necessity. The degree of necessi-

ty required in establishing an implied easement depends upon whether it is an implied easement by reservation [the grantor retains landlocked property] or by grant [the grantor grants landlocked property].

... Since the conveyance ... involved a transfer ... of the dominant estate ... any implied easement was by grant rather than reservation.

. . . .

... [C]ourts have required that only a reasonable necessity exist to prove an implied easement by grant.

*Id.* at 277–78 (citations omitted). *See also Attaway v. Davis,* 288 Ark. 478, 707 S.W.2d 302 (1986); *Granite Properties Ltd. v. Manns,* 117 Ill.2d 425, 433, 111 Ill.Dec. 593, 601, 512 N.E.2d 1230, 1238 (1987); *Badura v. Lyons,* 147 Neb. 442, 23 N.W.2d 678 (1946); *Jones v. Weiss,* 570 P.2d 948 (Okla.1977); *Bains v. Parker,* 143 Tex. 57, 182 S.W.2d 397 (1944), *aff'd,* 194 S.W.2d 569 (1946).

It is inescapably manifest that the trial court correctly found that a way of necessity had been created in 1931.

### 2.

### The Termination of Ways of Necessity

Two relatively early connected cases are significant in regard to how ways of necessity are construed when alternate ways *may* be available. They are: *Condry v. Laurie,* 184 Md. 317, 41 A.2d 66 (1945) (*Condry I* ) and *Condry v. Laurie,* 186 Md. 194, 46 A.2d 196 (1946) (*Condry II* ). The Lauries were the interior property owners (the dominant tenants) who claimed access to a public road over the property of Condry (the servient tenant). In *Condry I,* they first claimed a way by prescription by tacking on the use of their predecessor in title—the Hittles. The Court of Appeals rejected that claim, stating "the Hittles used the private road for more than twenty years in pursuance of a license, and therefore did not acquire a prescriptive right." *Id.* 184 Md. at 321, 41 A.2d 66. It went on to note, however, that:

The chancellor granted an injunction commanding defendants to remove the obstruction.... He based his decree ... on ... a way of necessity.... The doctrine is based upon public policy, which is favorable to full utilization of land and the presumption that parties do not intend to render land unfit for occupancy.... "But this way of necessity, is a way of new creation by operation of law, and is only provisional; for it is only brought into existence from the necessities of the estate granted, and continues to exist only so long as there may be a necessity for its use. If, therefore, the grantee acquires a new way ... the way of necessity is thereby extinguished." [Quoting from *Oliver v. Hook*, 47 Md. 301, 309 (1877).]

*Id.* 184 Md. at 321–22, 41 A.2d 66.

It was suggested that complainants could acquire access to the county road by a rear route. Complainants protested that it might cost as much as $500 to build a bridge over the creek.... [I]*f the cost of constructing a road over one's land ... would require unreasonable expense out of proportion to the value of the land, then there exists such necessity for a way over the grantor's land as to justify recognition of a way by implication.* But the court will not recognize a way of necessity if another road to the public highway can be made without unreasonable expense, even though the other road may be much less convenient.

*Id.* at 322, 41 A.2d 66 (citations omitted, emphasis added). *See also Stair v. Miller*, 52 Md.App. 108, 447 A.2d 109 (1982). *Condry I* was remanded for the trial court to determine whether yet another alternate right-of-way was available to the Lauries. In *Condry II* the court accepted the lower court's findings that a road over the Lauries' own property would cost $651.75, and that even if the Lauries had the right to use the "alternate road," it would cost between $1,000 to $2,000 to reopen it and another $400 to build a bridge over a stream. The court noted that the cost and present value of the Laurie property was $435. The Court of Appeals then held: "[T]he cost of constructing a road, other than the one in dispute ... would be out of proportion to the value of the land,

$435, and therefore ... a way of necessity exists to the appellees' land." *Condry II,* 186 Md. at 199, 46 A.2d 196. *See also Greenwalt v. McCardell,* 178 Md. 132, 12 A.2d 522 (1940). *But see Mullins v. Ray,* 232 Md. 596, 599, 194 A.2d 806 (1963) (citing *Condry v. Laurie,* 184 Md. 317, 41 A.2d 66). In *Mullins,* the dominant owner's property abutted a public road and the area was flat terrain similar to the proposed way of necessity. Thus, unreasonable expenses would not be incurred in constructing an alternate way.

The Court in *Hancock v. Henderson,* 236 Md. 98, 104–05, 202 A.2d 599 (1964), opined:

> [T]he [initial] necessity must be determined from the conditions as they existed at the time of the conveyance.... The theory is that such an easement, being appurtenant, passes with each conveyance to subsequent grantees. Hence a remote grantee of land not being used at the time of severance may nevertheless, when the use becomes necessary to the enjoyment of his property, claim the easement under his remote deed.... This rule is consonant with the generally held view that non-use alone is not sufficient to extinguish a way of necessity.... [Citations omitted, emphasis added.]

North Carolina is one foreign jurisdiction that has addressed this issue. The North Carolina appellate court stated:

> [T]he owner of the servient estate has the right to select the location of a way of necessity. This location must be reasonable with respect to the rights and convenience of the party entitled to the easement.... [D]efendant ... testified that the route selected by plaintiffs was not feasible and that it would involve a great expense to defendant....
>
> Since plaintiff's alternate route was not feasible to defendant and since there was evidence that the gravel road was the only way to reach defendant's land by vehicle from the public road, the judgment ... is affirmed.

*Harris v. Greco,* 69 N.C.App. 739, 318 S.E.2d 335, 339–40 (1984). Likewise, in *Beeson v. Phillips,* 41 Wash.App. 183, 702

P.2d 1244, 1247 (1985), the court, discussing statutory "ways of necessity," noted:

> Effective use ... means the ability to ... reach it in a reasonable manner....
>
> ....
>
> ... The cost of building a road up the side of the bluff would be prohibitive—even if construction were feasible.

And also *see Hayes v. Tompkins,* 287 S.C. 289, 337 S.E.2d 888 (1985), where the dominant tenant's property actually abutted a public road, but where the court found a way of necessity over the servient estate because the abutting property of the dominant tenant was "80 feet above the bottom of a gully ... along the public road's western side. Also, both a 40 or 50 foot draw ... adjacent to the public road ... obstructed access from the public road...." *Id.* 337 S.E. at 890. *But see McCamman v. Akers,* 58 Tenn.App. 703, 436 S.W.2d 457, 460 (1968):

> [T]he purpose for which the right-of-way of necessity [to Pickens Road] that was granted ... no longer exists. Since there has been a completion of purpose ... there can be no reason or necessity for continuing such a servitude upon defendant's property. A new means of access ... is reasonably sufficient.... Hence this brings about a termination of his easement of necessity....

The trial judge in the case *sub judice* found that the unimproved thirty foot strip of wilderness land acquired over the original grantor's southern boundary was not susceptible to egress/ingress in 1931, or now, because of the peculiar layout of the tract and its wilderness, *i.e.,* forested, wetland character. Judge Price further found that the cost of constructing a road along the thirty foot strip would be out of proportion to the value of the dominant estate. Reviewing the evidence, we note that a Mr. Rodney Schwarm was qualified as an expert in the U.S. Army Corps of Engineers permitting process and wetlands delineation. On appeal, no objection to his qualifications are presented. He testified that the thirty foot wide parcel was

a matrix of wetlands and upland areas. Every depression
in that soil ... is a nontidal wetlands.... [I]t's going to
require permits to cross a number of small nontidal wet-
lands.

. . . .

Within the forested area ... close to ⅔ of the right-of-way
was wetlands.

. . . .

... He would have to apply for a permit ... through the
Army Corps of Engineers, ... the Maryland Department of
the Environment, ... the Maryland Department of Natural
Resources ..., the Kent County Planning and Zoning [for
the part within the critical area] ... you would have to be
able to provide mitigation for it as well.

. . . .

... [T]hey are going to require 2 to 1 mitigation—2 acres
for every acre that you are going to disturb....

. . . .

... [I]t will come up to 2.27 acres of disturbance, which
would require 4.54 acres of mitigation.

Currently, to construct a road over the 3.497 acre strip of land
would require 6.81 acres of area—2.27 + 4.54 or more. Thus,
if only the 30 foot wide strip is used, it would be presently
impossible to accommodate the requirements of the road on
site.[6]

Mr. Schwarm also testified that the cost for the preparation
of a mitigation plan for a way constructed over the thirty foot
tract would be approximately $10,000. He testified that he
would charge $65 per hour for these additional services.

Mr. Baines was qualified as an expert in civil engineering.
He testified that he was retained to conduct a feasibility study
on whether a right-of-way over the thirty foot tract could be

---

**6.** We acknowledge that the authorities can authorize mitigation off site.
That has no bearing on whether this thirty foot strip can suffice for
access.

constructed that could safely accommodate vehicles, including emergency vehicles. Using basic guidelines, he testified:

The outside turning radius of a passenger vehicle is ... 24 feet ... [with an] inside radius of 15 feet.

. . . .

... [A] truck or a small bus ... has an outside turning radius of 42 with an inside of 28 ... a travelway at the corner's minimum width would be required of approximate 17 feet....

. . . .

... [F]ire truck[s] ... have an outside turning radius of about 44 feet and an inside ... of about 28 feet. So it's quite apparent that a[n] ... area, larger than a 7 or 8 foot wide gravel road, would be necessary to gain access....

. . . .

... [Y]ou would have to have ... 12 to 15 foot minimum for a paving area. Additionally ... you should have areas to pull off [for] a vehicle coming in, a vehicle going out type situation.

. . . .

... [A] tandem axle trailer [with] a 50 foot wheel base ... is your typical ... tractor and trailer or a moving van type situation....

. . . .

... [T]he outside turning radius of ... a tractor and trailer [is] 46, the inside turning radius [is] 5½.

. . . .

... [A] simple tractor trailer type rig ... can not [sic] make the corner without going off the [30 foot] right-of-way area.

. . . .

As a result of the investigation of the ... 30 foot area itself, it appears that it is insufficient to support access to the property in any acceptable manner.... The State Highway Administration ... will only accept a[n] entrance ... with a range of from 70 to 110 degrees. This areas

enters the state highway at approximately 140 degrees. . . .
[I]n my opinion it is a[n] unsafe intersection onto the state
highway.

He then testified that while fire trucks of today are proba-
bly wider and longer than they were in 1931, tractor/trailer
rigs have "really not changed in that period of time. . . .
[T]hey are basically the same design criteria."

Mr. Luff was qualified as an expert to testify as to the costs
associated with engineering, surveying, and associated design
work for constructing a right-of-way over the thirty foot strip.
He testified that the design work would cost approximately
$18,950.

Mr. Myers was qualified as an expert in the design and
construction layout of roads. He testified that it would be
"impossible and impractical" to construct a driveway on the
thirty foot strip and that construction easements would have
to be obtained from neighbors in order to accommodate the
equipment necessary to build the road.[7] In discussing the
sharp angles in the road, he noted "the raises would be so
short that most vehicles, other than the real small cars today,
would not be able to negotiate." He further testified that the
entrance to the state highway from the strip could not meet
state guidelines.

Mr. Lindstrom, a contractor, was qualified as an expert in
road construction and its cost. Basing his estimates on a
fifteen-foot road within the thirty foot strip, he estimated that
constructing the road would cost $345,000,[8] plus the cost of the
wetlands, engineering, etc. He testified that mitigation costs
would be approximately $78,000.

---

7. Easements would be necessitated because an area wider than the
road being constructed is required in the construction process.

8. Additionally, because no area owned by appellees is adjacent along
the strip, all debris generated would have to be removed over the 30
foot strip, *i.e.*, midway in the strip debris would have to be moved a half
mile one way or the other—to the highway and thence to a disposal site
or alternately a half mile to Mangels's other property.

██ Based upon the evidence we have mentioned, and that contained in the record but not specifically mentioned, we hold that Judge Price was correct in finding that the thirty foot strip of land was insufficient for reasonable access to the dominant estate of appellees, and that even if it were sufficient the costs and problems associated with opening up the right-of-way would be out of all reasonable proportion to the value of the dominant estate. He did not err.

### 3.

### Relocation of Ways of Necessity

██ In *Hanley v. Stulman*, 212 Md. 273, 279–80, 129 A.2d 132 (1957), the Court opined:

[A] right-of-way of necessity may be located by a court of equity where the right to such way is clear and undisputed. And this seems to be the law in regard to easements generally. [Citations omitted.]

*See also Stair*, 52 Md.App. at 111, 447 A.2d 109; *Michael v. Needham*, 39 Md.App. 271, 281, 384 A.2d 473, *cert. denied*, 283 Md. 736 (1978); *Amabile v. Winkles*, 34 Md.App. 435, 438, 367 A.2d 58, *cert. denied*, 280 Md. 727 (1977).

Quoting from *Sibbel v. Fitch*, 182 Md. 323, 328, 34 A.2d 773 (1943), the Court in *Weeks v. Lewis*, 189 Md. 424, 427, 56 A.2d 46 (1947), held "[w]hen a right of way reserved in general terms has been definitely located ... the general rule is that location of the way can be changed only by agreement of the owners of the dominant and servient tenements." *See also Amabile v. Winkles*, 276 Md. 234, 241, 347 A.2d 212 (1975); *Greenwalt*, 178 Md. at 137, 12 A.2d 522.

But *Weeks* was modified by the Court's subsequent holding in *Taylor v. Solter*, 247 Md. 446, 453, 231 A.2d 697 (1967), which also quoted *Sibbel*:

" 'Where an easement ... is granted in general terms, without giving definite location and description of it, the location may be subsequently fixed by an express agreement of the parties, *or by an implied agreement arising out*

*of the use of a particular way by the grantee. . . . [T]he practical location and use of such way by the grantee . . . acquiesced in for a long time by the grantor will . . . fix the location. . . .'"* [Emphasis added, citation omitted.]

*See also Amabile,* 276 Md. at 241, 347 A.2d 212; *Stevens v. Powell,* 152 Md. 604, 608, 137 A. 312 (1927); *Needham,* 39 Md.App. at 280, 384 A.2d 473.

The Court in *Zimmerman v. Cockey,* 118 Md. 491, 496–97, 84 A. 743 (1912), in a dispute between a grantor and grantee over the location of a way of necessity, where the grantors proposed a 460 foot long way and the grantee a 37 foot long way, opined:

The test in such cases is the question of a *reasonable access* to the property of the party claiming to be entitled to a way of necessity.

. . . .

. . . The mere statement of the two [460 feet v. 37 feet] is sufficient to show where the reasonableness . . . lies. [Citations omitted.]

The Court of Appeals noted in *Baker v. Frick,* 45 Md. 337, 340 (1876), involving a twenty foot wide road with ninety degree turns, that "[t]he road in question is a private way over the defendant's lands. 'Nothing passes as incident to such a grant, but that which is necessary for its reasonable and proper enjoyment.'" We cited *Baker* in *Everdell v. Carroll,* 25 Md.App. 458, 471, 336 A.2d 145 (1975), which involved the construction by the servient tenant of offsetting baffle barriers, or gates halfway over the right-of-way for the purpose of slowing down traffic. We noted evidence indicating that garbage trucks could only get through the baffle gates by opening them, that some fire apparatus had difficulty traversing past the baffle gates, and that some fire apparatus could not traverse the land even if the baffles were not present. *Id.* There was also evidence that the baffle gates were warranted by the traffic situation on the right-of-way. We held that some of the gates were permissible as devices necessary for the safe and normal use of the right-of-way by defendant and

others. *Id.* at 473, 336 A.2d 145. But we also held that one gate was impermissible because it required vehicles actually to leave the right-of-way in order to get around the gate and thus caused a relocation of the way. We reiterated: "A right-of-way may not be relocated without the consent of the owners of both the dominant and servient estates." *Id.* *See also Drolsum v. Lazuriaga,* 93 Md.App. 1, 17, 611 A.2d 116 (1992).

Foreign jurisdictions generally concur that the location and relocation of easements by necessity may be fixed by the parties or by use and acquiescence. In *Carleton v. Dierks,* 203 S.W.2d 552 (Tex.Civ.App.1947), the facts indicated that an old roadway had been established for over forty years. The parties agreed to relocate it and

> it was a part of the consideration for the new roadway that appellees relinquish all right to the old roadway.... [T]he agreement was in effect a re-routing or change in location of an existing roadway. It is a rule of general application that the location of an easement "may be changed with the express or implied consent of both parties, and an estoppel to claim a former location to be the true one arises from acquiescence in a change."

*Id.* at 555. *See also Meredith v. Eddy,* 616 S.W.2d 235, 240 (Tex.Civ.App.1981) (once way of necessity is established it may only be relocated with the express or implied consent of both parties); *Fort Quitman Land Co. v. Mier,* 211 S.W.2d 340, 343 (Tex.Civ.App.1948); *Ashby v. Justus,* 183 Va. 555, 32 S.E.2d 709 (1945).

There was evidence presented below that when Gale lane—the original way—became impassable, Beck, then allegedly one of the servient tenants, constructed another way adjacent to it. The appellees' predecessors commenced to use Beck lane as the way of necessity over the alleged servient parcel. Appellees' predecessors repaired and maintained the way. Appellants acquiesced over a long period in appellees' use of the way. The evidence supports the trial judge's findings that appellants consented, by acquiescence if not by intent, in the

relocation of the way of necessity. We perceive no error in Judge Price's findings on the issue.[9]

## 4.

## Increase in the Scope of the Way

25 Am.Jur.2d *Ways of Necessity* § 83, at 498 (1966) provides in part that:

[A] way of necessity is held to be coextensive with the reasonable needs, present *and future*, of the dominant estate; it varies with the necessity.... [Emphasis added, footnote omitted.]

■ In Maryland, and in most other jurisdictions, a right-of-way of a *specified* width generally does not grow as the size of vehicles, etc., increases. *See Feldstein v. Segall*, 198 Md. 285, 296, 81 A.2d 610 (1951). The same is not true for implied ways of necessity.

In *Tong v. Feldman*, 152 Md. 398, 136 A. 822 (1927), the Court of Appeals found utility service ways of necessity within a building and noted that the "right to continue piping gas

9. We note that in *Sibbel,* a case involving an express reservation of an undescribed right-of-way, the location of which was firmly established by long usage, the Court observed that "the same principles with reference to the location of a way of necessity and the location of a way reserved in general terms are applicable." The owner of the servient estate in *Sibbel,* the original grantee, later conveyed part of the property, over which about fifty feet of the established way ran, to the appellants' predecessor in title, retaining the land traversed by the greater part of the established right-of-way. When appellants built a new road or driveway, the owners of the easement used it instead of the old way, and then claimed that their permissive use had accomplished a change of location of their right-of-way. The Court stated that the appellants were not the owners of the servient tenement (except as to about fifty feet, about which there was no dispute) and that their grant of permission to use their driveway did not constitute an agreement to the relocation of the right-of-way from the servient tenement to their property.

We need not determine whether the holding or the language in *Sibbel,* where the right-of-way was created by express reservation, would apply with respect to relocation of a right-of-way of necessity. Since that issue was not initially timely raised below and was neither presented as an issue nor argued on appeal, we shall not address it.

through lower floors would, *under modern conditions,* come within those which it would be unreasonable to suppose the parties could intend to cut off." *Id.* 152 Md. at 402, 136 A. 822 (emphasis added).

> [M]ay any enlargement ever be made of the ways or instruments of necessity first made use of?
>
> ... [T]here is nothing in the nature of a right reserved or an easement, apart from an express prohibition, which prevents all change during the course of its enjoyment. . . . [T]here might be increases in the volume and kind of use. . . .
>
> And alterations may be made in the ways or instrumentalities of an easement of necessity. . . .
>
> . . . .
>
> The test ... is the purpose for which the right or easement has been established. Whenever it has arisen from necessity, it would seem to be co-extensive with the reasonable needs present *and future* of the dominant estate ... and to vary with the necessity, in so far as may be consistent with the full reasonable enjoyment of the servient tenement.

*Id.* 152 Md. at 402–05, 136 A. 822 (emphasis added).

Foreign jurisdictions generally agree that the scope of ways of necessity may be increased.

In the way of necessity "reservation" case of *New York Cent. Ry. Co. v. Yarian,* 219 Ind. 477, 39 N.E.2d 604, 606 (1942), the court, quoting *Thompson on Real Property,* Permanent Edition, Vol. 2, section 580, at 188, said:

> "The purpose for which an easement is established is the test for determining the mode and extent of its user and when the easement arises from necessity it is generally considered coextensive with the reasonable need, present *and future,* of the dominant estate ... *and to vary with the necessity. . . .* [Emphasis added.]

And see where the Virginia court held:

> "The kind of way, and the sort of and quantity of traffic over it are to be determined by the reasonable necessities

for the enjoyment of the land.... [T]he limits of the way are to be determined simply by the needs of the land at the time of the creation of the way, *but* the scope of the way may increase to meet the increased necessities of the property."

*Keen v. Paragon Jewel Coal Co.,* 203 Va. 175, 122 S.E.2d 543, 546 (1961) (quoting Ribbel, *Minor on Real Property,* 2d Ed., Vol. 1, § 98 at 134) (emphasis added). *See also Lease v. Doll,* 485 Pa. 615, 403 A.2d 558, 563 (1979); *Wagoner v. Jack's Creek Coal Corp.,* 199 Va. 741, 101 S.E.2d 627 (1958).

We hold that the scope of ingress/egress ways of necessity may reasonably increase with the dominant estate's necessary and reasonable needs as those needs exist, present and future. We further hold that the trial court's establishment of Beck lane as being fifteen feet wide and its declaration that the lane could be paved and maintained by appellees reflects the current needs of the dominant estate owned by appellees. We note that there was testimony by Mr. Lindstrom that he had, in the past, inspected Beck lane (and apparently done improvement and maintenance work on it). He testified that the improved portion was twelve to thirteen feet in width and that the total right-of-way was even then fifteen feet. If so, that width was already established prior to Judge Price's opinion, which, in any event, we hold was not erroneous.

## Conclusion

In addressing the four issues we framed in this opinion, we have addressed all issues necessary to resolve the remaining questions in the case, whether those questions are specifically framed in our resolutions. Accordingly, we do not deem it necessary to address the issues further. We shall affirm Judge Price's declaratory judgment.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.