**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

STEVEN H. OKEN,
Petitioner-Appellant,

v.

THOMAS CORCORAN, Warden of the
Maryland Correctional Adjustment

Center and the Maryland
Penitentiary; J. JOSEPH CURRAN, JR.,
Attorney General of the State of
Maryland,
Respondents-Appellees.

No. 99-27

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-97-585-PJM)

Argued: May 1, 2000

Decided: July 18, 2000

Before WILKINSON, Chief Judge, and LUTTIG
and MICHAEL, Circuit Judges.

_____

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Chief Judge Wilkinson joined. Judge Michael wrote a concur-
ring opinion, concurring in all but Part II.A. of the majority opinion
and concurring in the judgment.

_____

**COUNSEL**

**ARGUED:** Fred Warren Bennett, BENNETT & NATHANS, L.L.P.,
Greenbelt, Maryland, for Appellant. Ann Norman Bosse, Assistant

Attorney General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees. **ON BRIEF:** Christopher M. Davis, DAVIS & DAVIS, Washington, D.C., for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL, Baltimore, Maryland, for Appellees.

_____

**OPINION**

LUTTIG, Circuit Judge:

Petitioner-appellant Steven Howard Oken, a Maryland inmate under sentence of death, appeals from the district court's denial of his application under 28 U.S.C. § 2254 for a writ of habeas corpus. Oken claims, <u>inter alia</u>, that the state trial court's voir dire questions were constitutionally inadequate under <u>Morgan</u> v. <u>Illinois</u>, 504 U.S. 719 (1992), and that he surrendered his right to testify at the criminal responsibility phase of his trial in reliance on advice from the trial court that was erroneous under <u>Simmons</u> v. <u>United States</u>, 390 U.S. 377 (1968). Because we conclude that the district court correctly upheld the Maryland Court of Appeals' rejection of these and other claims advanced by Oken, we affirm the district court's judgment denying Oken's petition for a writ of habeas corpus.

I.

Oken was sentenced to death in 1991 by a Baltimore County jury for the murder of Dawn Garvin.**1** Four years earlier, Garvin's naked corpse had been found by her father in the bedroom of her apartment, with two contact gunshot wounds to her head and a bottle protruding from her vagina. A .25 caliber handgun seized from Oken's bedroom was later determined to be the murder weapon, and a piece of rubber recovered from the crime scene was traced to Oken's tennis shoes. Moreover, several of Garvin's neighbors identified Oken as the person who had attempted to gain entry to their residences under various

_____

**1** Oken was separately convicted of murdering his sister-in-law, Patricia Hirt, as well as a motel clerk in Maine, Lori Ward.

false pretenses a few days prior to Garvin's murder. On direct review, the Maryland Court of Appeals affirmed Oken's convictions for first degree murder and first degree sexual offense, as well as his sentence of death, but reversed his conviction and sentence for burglary.**2** See Oken v. State, 612 A.2d 258, 283 (Md. 1992) ("Oken I"), cert. denied, 507 U.S. 931 (1993). On state collateral review, the Maryland Court of Appeals again rejected Oken's challenges to his conviction and sentence, affirming the lower court's denial of Oken's petition for post-conviction relief. See Oken v. State, 681 A.2d 30, 53 (Md. 1996) ("Oken II"), cert. denied, 519 U.S. 1079 (1997). Oken then filed an application for a writ of habeas corpus in federal district court, pursuant to 28 U.S.C. § 2254. The district court denied Oken's application for a writ of habeas corpus and subsequently denied his motion for reconsideration.

II.

To determine whether the Maryland Court of Appeals' rejection of Oken's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), we apply the standard of review set forth by the Supreme Court in Williams v. Taylor, 120 S. Ct. 1495, 1523 (2000), which with one exception affirmed this court's interpretation of section 2254(d)(1) in Green v. French , 143 F.3d 865 (1998), cert. denied, 525 U.S. 1090 (1999). Specifically, the Court affirmed the following interpretation of the "contrary to" clause that we set forth in Green:

> [A] decision is "contrary to" precedent only when, either through a decision of pure law or the application of law to facts indistinguishable in any material way from those on the basis of which the precedent was decided, that decision reaches a legal conclusion or a result opposite to and irreconcilable with that reached in the precedent that addresses the identical issue.

_____

**2** Oken's former conviction and sentence for burglary, set aside on direct appeal, are not at issue in this case.

3

143 F.3d at 870. See Williams, 120 S. Ct. at 1519 (holding that the preceding interpretation "accurately reflects th[e] textual meaning" of the word "contrary"). The Court then restated the governing standard in the following terms, which correspond closely with the preceding sentence, and to which we of course adhere in reviewing Oken's claims:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.

Id. at 1523. The Court also upheld the following interpretation of the "unreasonable application" clause that we set forth in Green:

> [A] decision represents an "unreasonable application of" precedent only when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable, or when that decision recognizes the correct principle from the higher court's precedent, but unreasonably applies that principle to the facts before it[.]

143 F.3d at 870. See Williams, 120 S. Ct. at 1520 (holding that the preceding interpretation was "generally correct").**3** The Court then restated the governing standard in the following terms, to which we of course also adhere in reviewing Oken's claims:

_____

**3** The Court did, however, leave open the question of whether "a decision represents an `unreasonable application of' precedent [. . .] when that decision applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable, [or] when that decision fails to apply the principle of a precedent in a context where such failure is unreasonable," Green, 143 F.3d at 870, finding that "[a]lthough th[is] holding may perhaps be correct," "[t]oday's case does not require us to decide" whether in fact it is, Williams, 120 S. Ct. at 1521.

4

> Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 1523.

The Court also adopted our holding that the "unreasonable application" inquiry is an objective one, see Green , 143 F.3d at 870 ("the writ of habeas corpus should issue [. . .] if[the state court's] decision rests upon an objectively unreasonable application of established principles to new facts" (emphasis added)). Nevertheless, it rejected our statement that state courts unreasonably apply clearly established federal law only when they "interpret[ ] or apply[ ]" such law "in a manner that reasonable jurists would all agree is unreasonable," Green, 143 F.3d at 870, on the ground that this statement "would tend to mislead federal habeas courts by focusing their attention on a subjective inquiry rather than on an objective one," Williams, 120 S. Ct. at 1522. Although the Court rejected reference to "all reasonable jurists" in conducting the "unreasonable application" inquiry, we thus understand the Court to have affirmed our categorical holding that the relevant inquiry is an objective one. See supra.

A.

Oken argues that the district court erred in denying him relief on his claim that the state trial court's voir dire questions were constitutionally inadequate under Morgan v. Illinois, 504 U.S. 719 (1992), because they failed to satisfy Morgan's requirement of an "inquiry" sufficient to identify "those jurors who, even prior to the State's case in chief, had predetermined [. . .] whether to impose the death penalty," id. at 736. Specifically, Oken contends that, even though the trial judge asked some of the potential jurors follow-up questions, the initial questions propounded to every member of the jury panel were inadequate to identify all of the potential jurors who would need to be asked follow-up questions in order to satisfy the dictates of Morgan.

We reject this claim as procedurally defaulted, and, in the alternative, on its merits.

5

1.

We reject Oken's Morgan claim as procedurally defaulted because he failed to raise this claim on direct appeal in Oken I and thereby waived it as a matter of state law, and because, as a matter of state law, he failed to show special circumstances excusing this waiver. See Oken II, 681 A.2d at 36-38. We are satisfied that this state procedural rule requiring that, absent special circumstances, issues first be raised on direct review is both "independent" and "adequate," as required by Coleman v. Thompson, 501 U.S. 722, 750 (1991). It is "adequate" because it is "consistently or regularly applied," Johnson v. Mississippi, 486 U.S. 578, 587 (1988), by Maryland courts. See, e.g., McElroy v. State, 617 A.2d 1068, 1070, 1075 (Md. 1993); Smith v. Warden, Maryland Penitentiary, 243 A.2d 897, 898 (Md. Ct. Spec. App. 1968), cert. denied sub nom. Smith v. Maryland, 393 U.S. 989 (1968); Anglin v. Director, Patuxent Institution, 232 A.2d 532, 533 (Md. Ct. Spec. App. 1967), cert. denied sub nom. Anglin v. Maryland, 389 U.S. 873 (1967). We are also satisfied that this procedural bar is sufficiently "independent" of federal law, even though the Maryland Court of Appeals, in applying it, referred to Johnson v. Zerbst, 304 U.S. 458 (1938), since the Maryland court's decision does not "fairly appear to rest primarily on federal law or to be interwoven with federal law," Coleman, 501 U.S. at 735, 740. The rule that issues must first be raised on direct appeal, on which the Maryland court based its decision that Oken's Morgan claim was waived, is itself clearly a state-law rule. See cases cited supra . Admittedly, the Maryland court did look to federal law in making the antecedent determination that this waiver need not be "intelligent and knowing." Because Maryland caselaw has relied in part on Johnson v. Zerbst in construing the scope of Md. Code Art. 27, § 645A(c)'s "intelligent and knowing" waiver standard, see, e.g., McElroy, 617 A.2d at 1070, the Maryland court did look to federal law in determining that this waiver standard did not apply. Nevertheless, we cannot say that, by virtue of this fact alone, the Maryland court's decision "rest[s] primarily on federal law" or is "interwoven with federal law." To the extent that the Maryland court did look to federal law in making the antecedent determination that the waiver need not be "intelligent and knowing," the court's reliance on federal law was limited to one aspect of the holding in Morgan and to state-law precedents applying Johnson's dicta that "fundamental constitutional rights" may be waived only intelli-

6

gently and knowingly, 304 U.S. at 464. And, more importantly, the Maryland court did not look primarily to federal law in making this antecedent determination. Rather, it based its determination in large part on the state-law premise that the failure to raise a Morgan claim on direct appeal is the sort of "tactical decision of counsel" that Maryland courts have, as a matter of state law, construed as falling outside the intended scope of section 645A(c). See Oken II, 681 A.2d at 37 (citing Curtis v. Maryland, 395 A.2d 464, 474 (Md. 1978)).

Under the rule of Coleman v. Thompson , we are therefore barred from reviewing the merits of Oken's Morgan claim, unless Oken has demonstrated that the "failure to consider [this claim] will result in a fundamental miscarriage of justice" or that sufficient "cause" and "prejudice" exist to excuse this procedural default. Coleman, 501 U.S. at 750. Oken has demonstrated neither. He makes no argument that the failure to consider his Morgan claim will result in a "fundamental miscarriage of justice." And the only "cause" that Oken has advanced for this procedural default -- the ineffective assistance of his Oken I appellate counsel -- was itself procedurally defaulted because Oken failed to make any mention of it in his opening brief to the Maryland Court of Appeals in Oken II. See Oken II, 681 A.2d at 36 n.5; see also Health Servs. Cost Review Comm'n v. Lutheran Hospital of Maryland, Inc., 472 A.2d 55, 61 (Md. 1984) (holding that issues raised only in the reply brief, and not the opening brief, are waived); Federal Land Bank of Baltimore, Inc. v. Esham, 406 A.2d 928, 938 (Md. Ct. Spec. App. 1979) (same). And Oken has also failed to make any showing of "cause" and "prejudice" to excuse this last procedural default. Thus, the alleged ineffective assistance of Oken's appellate counsel cannot serve as "cause" to excuse Oken's failure to raise his Morgan claim on direct appeal. See Edwards  v. Carpenter, 120 S. Ct. 1587, 1592 (2000). Consequently, we reject Oken's Morgan claim as procedurally defaulted, and thus we need not reach the merits of this claim.

2.

Even if we were to reach the merits of Oken's Morgan claim, we would still deny Oken relief on this ground because the Maryland Court of Appeals' rejection of his Morgan claim was not "contrary

7

to," or an "unreasonable application of," Morgan. The four questions initially asked of every member of the jury panel were as follows:

> [1.] Do you have any strong feelings, one way or the other, with regard to the death penalty?

> [2.] Do you feel that your attitude, regarding the death penalty, would prevent or substantially impair you from making a fair and impartial decision on whether the Defendant is not guilty or guilty, based on the evidence presented and the Court's instructions as to the law?

> [3.] Do you feel your attitude, regarding the death penalty, would prevent or substantially impair you from making a fair and impartial decision on whether the Defendant was or was not criminally responsible by reason of insanity, based on the evidence presented and the Court's instructions on the law?

> [4.] Do you feel that your attitude, regarding the death penalty would prevent or substantially impair you from sentencing the Defendant, based upon the evidence presented and the Court's instructions as to the law which is applicable?

Oken II, 681 A.2d at 38-39. These questions were not the sort of "general fairness and `follow the law' questions" that the Court held inadequate in Morgan, 504 U.S. at 734; see id. at 724 ("Do you know of any reason why you cannot be fair and impartial?"; "Do you feel you can give both sides a fair trial?"). Rather, they explicitly referred to the death penalty and asked whether the potential juror's feelings about the death penalty were "strong." Compare United States v. Tipton, 90 F.3d 861, 878-79 (4th Cir. 1996) (holding that "the district court's inquiry into death penalty attitudes was sufficient" to satisfy the dictates of Morgan, where the only question propounded to every member of the jury panel explicitly referred to the death penalty and asked whether the potential juror's feelings about the death penalty were "strong"), cert. denied, 520 U.S. 1253 (1997). Moreover, we fail to see any meaningful difference between the question "Do you have strong feelings in favor of the death penalty?", which Oken apparently

8

concedes would be adequate, <u>see</u> Appellant's Br. at 15-16 (citing <u>Tip-ton</u>, 90 F.3d at 878), and the first question asked here -- "Do you have any strong feelings, one way or the other, with regard to the death penalty?". Fairly read, the initial four questions, if truthfully answered, would have enabled the trial court to determine whether a potential juror's feelings about the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," <u>Morgan</u>, 504 U.S. at 728 (citation omitted). Consequently, even if the trial court had not asked several of the potential jurors additional follow-up questions on an individual basis, as the court did here, we would still be satisfied that the initial four questions asked of every member of the jury panel were by themselves sufficient to satisfy <u>Morgan</u>'s requirement of an "inquiry" sufficient to identify "those jurors who, even prior to the State's case in chief, had predetermined [. . .] whether to impose the death penalty," <u>id</u>. at 736; <u>see also id</u>. at 729 ("The Constitution [. . .] does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury.").**4**

B.

Oken argues that the trial court erroneously advised him that any testimony he provided at the criminal responsibility phase could be used against him during the sentencing phase and that this erroneous advice misled him into surrendering his right to testify at the criminal responsibility phase of his trial.**5** Oken contends that the court's advice was erroneous because, under <u>Simmons</u> v. <u>United States</u>, 390 U.S. 377 (1968), any testimony that he gave at the criminal responsibility phase could not be used against him at the later sentencing phase.

_____

**4** We also reject the suggestion that the trial court was required to ask potential jurors whether they would automatically impose the death penalty in rape-murder cases because, as Oken conceded at oral argument, <u>Morgan</u> does not require crime-specific voir dire questions.

**5** The criminal responsibility phase, which Oken elected to have decided by the trial judge sitting without the jury, followed the guilt/innocence phase, which was heard by a jury, and preceded the sentencing phase, which was heard by the same jury.

In making this last claim, Oken cannot, and does not, directly rely upon the stated holding of Simmons "that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection," 390 U.S. at 394. Rather, he relies only upon the broadly worded rationale offered by the Simmons Court for its holding -- namely, that "it [is] intolerable that one constitutional right should have to be surrendered in order to assert another," id. Based on this rationale, Oken argues that, unless his testimony at the criminal responsibility phase is inadmissible against him at the sentencing phase, his right to testify at the criminal responsibility phase would "have to be surrendered in order to assert" his Fifth Amendment right not to be compelled to incriminate himself at the later sentencing phase.

We conclude that the Maryland Court of Appeals' rejection of this claim was not "contrary to," or an "unreasonable application of," Simmons because, had the criminal responsibility phase been tried to the jury, as opposed to the judge sitting without the jury, then it would not have been "contrary to," or an "unreasonable application of," Simmons to hold that any testimony that Oken gave at the criminal responsibility phase could be used against him at the later sentencing phase, and because we see no reason why a different result should obtain simply because the criminal responsibility phase was tried to the judge sitting without the jury.**6**

_____

**6** In concluding that the trial court did not run afoul of Simmons by advising Oken that any testimony he gave at the criminal responsibility phase could be used against him at the later sentencing phase, the Maryland court reasoned that in McGautha v. California, 402 U.S. 183 (1971), vacated in part on other grounds sub nom . Crampton v. Ohio, 408 U.S. 941 (1972), the Court "declared that its earlier decision in Simmons was strictly limited to the protection of a defendant's testimony in a hearing on a motion to suppress evidence alleged to have been obtained in violation of his constitutional rights," Oken I, 612 A.2d at 263 (citing McGautha, 402 U.S. at 211-12). To avoid the question of the continued authority of McGautha in the wake of its partial vacatur, we uphold the Maryland court's decision that the trial court's advice did not run afoul of Simmons on different grounds.

10

Had the criminal responsibility phase been tried to the jury, it would not have been "contrary to," or an "unreasonable application of," Simmons to hold that any testimony that Oken gave at the criminal responsibility phase could be used against him at the later sentencing phase because the Supreme Court has, post-Simmons, consistently upheld and assumed the validity of bifurcated capital-murder proceedings in which the same jury hears the evidence at both the guilt/innocence and sentencing phases without being instructed that the defendant's testimony at the guilt/innocence phase may not be used against the defendant at the sentencing phase. See, e.g., Romano v. Oklahoma, 512 U.S. 1 (1994) (assuming the validity of such a proceeding); Buchanan v. Kentucky, 483 U.S. 402, 417 (1987) (reaffirming "that the State's interest in having a single jury decide all the issues in a capital trial was proper," without intimating any need for instructing the jury that the defendant's testimony in the guilt/innocence phase may not be used against the defendant in the sentencing phase); Lockhart v. McCree , 476 U.S. 162, 180 (1986) ("We have upheld against constitutional attack the Georgia capital sentencing plan which provided that the same jury must sit in both phases of a bifurcated capital murder trial," and which did not require that the jury be instructed that the defendant's testimony in the guilt/innocence phase may not be used against the defendant in the sentencing phase); Gregg v. Georgia, 428 U.S. 153, 190-92, 195, 207 (1976) (plurality opinion); 428 U.S. at 207-08 (White, J., concurring in the judgment). Indeed, the Court has never even suggested the need for such an instruction. Consequently, although the Court has never squarely held that the jury need not be instructed that the defendant's testimony in the guilt/innocence phase may not be used against the defendant in the sentencing phase, we cannot say that it would be "contrary to," or an "unreasonable application of," Simmons to so hold, given that the Court has repeatedly upheld state capital-murder proceedings that have not included such an instruction. And, again, we see no reason, nor could Oken at oral argument suggest any reason, why a different result should obtain simply because the criminal responsibility phase was tried to the judge sitting without the jury.

Even if a different result should obtain when the criminal responsibility phase is tried to the judge sitting without the jury, Oken still does not have a colorable claim that he "ha[d] to [. . .] surrender[ ]" his right to testify at the criminal responsibility phase "in order to

11

assert" his Fifth Amendment privilege against compelled self-incrimination at the sentencing phase because, assisted by counsel, he <u>chose</u> to have the criminal responsibility phase tried to the judge sitting without the jury. And that choice itself, which was provided for only by state law, <u>see</u> Md. R. Cr. P. 4-314(b)(5)(B), did not involve the exercise of a federal constitutional right, <u>see Lockhart</u>, cited <u>supra</u> at 11 (reaffirming the Court's decision in <u>Gregg</u> upholding Georgia's capital sentencing plan under which "the same jury <u>must</u> sit in both phases of a bifurcated capital murder trial" once the defendant elects to have the first phase tried to a jury (emphasis added)).

C.

Oken next argues that there is insufficient evidence to sustain his conviction for first degree sexual offense. And because the state obtained the death penalty based only upon the aggravating circumstance that Oken murdered Garvin while committing or attempting to commit a first degree sexual offense against her, Oken contends that he may not lawfully be executed. No rational trier of fact could have found him guilty beyond a reasonable doubt of first degree sexual offense, Oken argues, because there was insufficient evidence that Garvin was alive when her vagina was penetrated with the bottle. Oken focuses in particular on the fact that the medical examiner found no evidence of trauma to Garvin's groin area, which, Oken argues, suggests that Garvin was not alive when the bottle was inserted into the vagina.

We disagree. "[V]iewing the evidence in the light most favorable to the prosecution," a "rational trier of fact could have found the essential elements of [first degree sexual offense] beyond a reasonable doubt," <u>Jackson</u> v. <u>Virginia</u>, 443 U.S. 307, 319 (1979). Because Garvin's clothing was found strewn about the living room floor, because her pants were found turned inside out, and because her brassiere was still fastened but ripped on the side, a rational trier of fact could have inferred that Garvin resisted perpetration of the sexual offense upon her and thus was alive at the time that the offense was committed. <u>See Oken I</u>, 612 A.2d at 275-76. More importantly, the police recovered from Oken's home a list in Oken's handwriting that included the following items: "gauze pads; [. . .] chloroform, [. . .], gag; sock and adhesive tape, [. . .] dildos; vibrators," <u>Oken I</u>, 612

12

A.2d at 276. From this list, a rational factfinder could have inferred that Oken had planned to restrain and perpetrate a sexual offense upon a live victim; such a factfinder could have then drawn the additional inference that Oken did in fact carry out such a plan. Moreover, a rational factfinder could have concluded that the absence of signs of trauma to Garvin's groin area is not inconsistent with the bottle having been inserted into Garvin's vagina while Garvin was still alive because Oken wielded a gun at the time and could have therefore coerced Garvin into cooperating with the insertion of the bottle.

D.

Oken argues that his trial counsel was constitutionally ineffective in failing adequately to prepare two expert witnesses, Drs. Payson and Berlin, who testified on direct examination at the sentencing phase that Oken suffered from "sexual sadism," a mental disorder for which, they testified, there is presently no cure. J.A. 663, 672, 759. Counsel's failure to prevent Oken's experts from describing him as an incurable sexual sadist, Oken argues, "fell below an objective standard of reasonableness" and prejudiced him in the eyes of the jury, Strickland v. Washington, 466 U.S. 668, 688, 694 (1984).

We disagree, and we are confident that, in rejecting this claim, the Maryland Court of Appeals did not render a decision that was "contrary to," or "an unreasonable application of," Strickland. Trial counsel's presentation of evidence of Oken's sexual sadism did not fall below an objective standard of reasonableness because it was a reasonable attempt to prove, as a mitigating circumstance, that Oken suffered from a recognized mental disorder. See Oken II, 681 A.2d at 47. To implement such a defense strategy, which succeeded in persuading at least one member of the jury, see J.A. 840 (form containing jury's "findings and sentence determination," in which the jury certified that "[o]ne or more of us" found sexual sadism to be a mitigating circumstance), trial counsel had to establish, through the testimony of Drs. Payson and Berlin, the factual bases for their diagnosis of Oken's sexual sadism; such a diagnosis would not have been persuasive as a mitigating factor had Drs. Payson and Berlin not fully explained it to the jury. In preparing Drs. Payson and Berlin to provide such an explanation, trial counsel could not have specifically instructed the doctors to avoid characterizing sexual sadism as incurable, since it would have

13

been improper to have instructed the doctors as to the specific content of their testimony. See Oken II, 681 A.2d at 47 (citing, inter alia, State v. Earp, 571 A.2d 1227, 1235 (1990) (cautioning attorneys that, in preparing witnesses, they should "avoid suggesting to the witness what his or her testimony should be")). And Oken was not prejudiced, because even if counsel had ignored this admonition by Maryland's highest court, the prosecution almost certainly would have elicited, through cross-examination or direct examination of other expert witnesses, a similar description of the current prospects for treating sexual sadism.

E.

We are also unpersuaded by the other claims of ineffective assistance of counsel advanced by Oken. First, trial counsel was not constitutionally ineffective in failing to object to, or move for a mistrial based on, certain remarks made by the prosecutors in their closing argument because it would have been futile for counsel to have done so, given the "wide latitude" accorded counsel in making closing arguments, Oken I, 612 A.2d at 281, and given that the prosecutors' remarks, read in context, did not constitute an improper comment on Oken's failure to testify or otherwise infringe upon Oken's constitutional rights.[7]

Second, trial counsel was not constitutionally ineffective in advising Oken to enter a conditional guilty plea to Lori Ward's murder in Maine. Oken argues that counsel was ineffective because counsel incorrectly advised him that the Maine guilty plea would not be admissible against him in Maryland, and because counsel incorrectly advised him that, under the Interstate Agreement on Detainers ("IAD"), the Maine guilty plea would shield him from Maryland's death penalty by virtue of his having to first serve his Maine sentence

_____

[7] The prosecutors indirectly referred to Oken as a "monster," commented upon his demeanor during the trial, stated that "[t]he defendant said some things through his attorney in opening that I wanted to address," noted that Oken "really doesn't dispute any" of the prosecution's evidence, and called upon the jury to make the same "kind of a personal sacrifice" that U.S. soldiers fighting the Persian Gulf War were making at the time of the trial. J.A. 246, 197, 245, 819.

14

of life imprisonment before any Maryland sentence could be satisfied. Oken contends that he was prejudiced by this erroneous advice because, absent such advice, he would not have pled guilty in Maine, and thus would have been eligible for another potential mitigating factor at the sentencing phase of his Maryland trial-- namely, the absence of prior convictions for crimes of violence, see Md. Code Art. 27, § 413(g)(1). We reject Oken's claim as meritless.

Trial counsel's performance did not fall below an objective standard of reasonableness because at the time that counsel advised Oken to plead guilty in Maine, "there was no way of knowing the Governors of the two states would enter into" an executive agreement trumping the IAD, as they did after the proceeding in Maine, see J.A. 862, nor was it by any means "certain that this plea would be admissible in the [Maryland] proceeding," Oken II, 681 A.2d at 50; see, e.g., Md. R. Evi. 5-403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury [. . .]"). Further, Oken cannot show that he was prejudiced by counsel's advice because, even had he not pled guilty in Maine, he would have almost certainly been convicted in Maine prior to his trial for Garvin's murder in Maryland, see Oken II, 681 A.2d at 50 ("[Oken]'s own[post-conviction] expert admitted the case against [him] in Maine was overwhelming."), since at the time of his arrest in Maine and the commencement of Maine's proceedings against him, Maryland had not yet filed formal charges against him in connection with Garvin's murder, see J.A. 851.

Third, trial counsel was not constitutionally ineffective at the sentencing phase in failing to present sufficient evidence of Oken's parole ineligibility under Maine law. The jury was adequately apprised of Oken's parole ineligibility through the introduction into evidence of Oken's pre-sentence investigation report, which "showed that Oken had been sentenced in Maine to life imprisonment without parole," and through counsel's opening statement and closing argument. See Oken II, 681 A.2d at 41; see , e.g., J.A. 822-24 ("His punishment [in Maine] was life without parole. The man is already in jail in a prison for the rest of his days, life without parole, and that means life without parole. He isn't going anywhere. If you found him not guilty [. . .], he would go back to the state of Maine and spend the rest of his life in jail there.").

15

Fourth, trial counsel was not constitutionally ineffective in failing to adduce sufficient evidence of Oken's substance abuse at the time of the Garvin murder. Counsel presented substantial evidence of Oken's substance abuse "through the testimony of Oken's ex-wife, father, mother, acquaintances, and [. . .] Dr. Berlin, Dr. Payson, and Dr. Spodak." Oken II, 681 A.2d at 45; see, e.g., J.A. 545-49, 557-59, 603-19, 640-43, 723-24, 780. Any further evidence of his substance abuse would have been nothing more than cumulative. **8**

Finally, even were we to find one or more of these purported instances of objectively unreasonable performance by counsel to be such, either individually or cumulatively, we still could not say that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 694. Even Oken's own expert testified on cross-examination during the sentencing phase:

> I was told by Mr. Oken that he approached the victim outside the apartment, asked if he could use the phone, made his way into her apartment, looked about, shut the door, took out a gun and asked that she get undressed. He asked her to begin masturbating. He masturbated. At the same time he then asked her to get up and perform oral sex on him. He then pushed her back. He got on top of her, he tried to have intercourse, he did this in different positions, including anal sex. He got up at some point, went into the kitchen, brought back a bottle, Durkee's hot sauce bottle, which he said he inserted into her vagina. He made her take the bottle in and out. He was masturbating at the same time. He became angry because he couldn't reach climax and then he killed her.

Oken I, 612 A.2d at 679; see also J.A. 772-73. Thus, the jury had before it an overwhelming amount of evidence of the aggravating cir-

_____

**8** As to the remainder of Oken's claims, we agree with the district court that Oken has failed to make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). We therefore deny a certificate of appealability as to these claims, as did the district court, and dismiss the appeal as to these claims.

16

cumstance of the first degree sexual offense to outweigh both the mitigating evidence which was introduced at trial and that which Oken now contends should have been introduced.

CONCLUSION

The judgment of the district court denying Steven Howard Oken's petition for a writ of habeas corpus is hereby affirmed.

AFFIRMED

MICHAEL, Circuit Judge, concurring:

I concur in the judgment and in all but part II.A. of the majority opinion. As for part II.A., I agree that Oken has procedurally defaulted the claim he asserts under Morgan v. Illinois, 504 U.S. 719 (1992), though I come to that conclusion by a different course than does the majority. If we could reach the merits of the Morgan claim, I would vote to grant the writ so as to allow Oken a new sentencing proceeding.

I.

Oken's trial counsel objected to the trial court's voir dire and requested additional questions aimed at identifying jurors who would impose the death penalty regardless of mitigating evidence. The trial court overruled the objection and refused to ask the questions tendered by Oken's counsel. On direct appeal Oken was represented by a different lawyer. That lawyer failed to appeal the voir dire issue, believing that the questions actually asked satisfied the requirements of Wainwright v. Witt, 469 U.S. 412 (1985). After oral argument on Oken's direct appeal, but before the Maryland Court of Appeals rendered its decision, the United States Supreme Court decided Morgan. In Morgan the Court held that a capital defendant, upon his request, must be allowed to ask "reverse Witterspoon "[1] questions on voir dire

_____

[1] See Witherspoon v. Illinois , 391 U.S. 510 (1968). Witherspoon permits voir dire to determine whether a potential juror would always refuse to impose the death penalty upon conviction. "Reverse Witherspoon" voir dire is intended to determine a pro-death bias on the part of a prospective juror. See Morgan, 504 U.S. at 722.

17

in order to determine whether particular jurors would always vote to impose death following a capital conviction. See 504 U.S. at 736. Although Oken's appellate counsel read Morgan when it was decided, she did not "associate[ ] Morgan with the Oken case." As a result, she did not seek leave to file a supplemental brief on the voir dire issue.

After the Maryland Court of Appeals affirmed his conviction and sentence and the United States Supreme Court denied his petition for certiorari, Oken filed a state habeas petition in Maryland circuit court. There Oken argued (1) that the trial court had violated Morgan in failing to ask "reverse Witherspoon" questions on voir dire and (2) that appellate counsel had been ineffective in failing to raise the issue. Although the state contended that Oken had waived his Morgan claim by not raising it on direct appeal, the state habeas court proceeded directly to the merits, holding that the trial court's follow-up questions satisfied Morgan. The state habeas court then went on to hold that Oken's appellate counsel had not been constitutionally ineffective in failing to raise the Morgan claim on direct appeal.

Oken petitioned the Maryland Court of Appeals for leave to appeal the decision of the state habeas court. In his petition he argued the merits of his Morgan claim and argued that his appellate counsel on direct appeal had been ineffective in failing to raise that claim. The Court of Appeals granted leave to appeal all issues raised in the petition. In his opening brief in the habeas appeal, Oken argued the merits of his Morgan claim, but mentioned the ineffectiveness of appellate counsel issue only in a footnote. In the footnote Oken asserted that the Court of Appeals had granted the relief sought on his ineffective assistance claim when it granted him leave to appeal the merits of the state habeas court's decision on the Morgan issue. The ineffective assistance of appellate counsel claim was therefore moot, according to Oken. The state argued in its response that Oken's counsel on direct appeal had waived the Morgan claim and that Oken had now abandoned his claim of ineffective assistance of appellate counsel. In his reply brief Oken denied any intent to abandon his ineffective assistance claim, but offered no argument in support of that claim. As to waiver, Oken contended (1) that the Morgan claim had not been knowingly and intelligently waived, and thus was not waived under Maryland law; (2) that Maryland's "special circumstances" exception to waiver applied because the Supreme Court's Morgan decision

18

came down after oral argument on his direct appeal; and (3) that <u>Morgan</u> was a new rule decided while his case was still on direct appeal, so he should be permitted to raise it on collateral review.

The Court of Appeals (on habeas) rejected Oken's argument that his ineffective assistance of appellate counsel claim was moot and held, without discussion, that he had abandoned that claim. <u>See Oken II</u>, 681 A.2d at 36 n.5. The <u>Morgan</u> claim thus was presented solely as a trial court error, and the Court of Appeals proceeded to the question whether Oken had waived that claim of error by failing to raise it on direct appeal. With one judge dissenting, the Court of Appeals concluded that the <u>Morgan</u> issue had been waived on direct appeal. The court held that Maryland's "knowing and intelligent" requirement for waiver applied only in the same circumstances as the "knowing and intelligent" standard of <u>Johnson v. Zerbst</u>, 304 U.S. 458 (1938), and <u>Fay v. Noia</u>, 372 U.S. 391 (1963), <u>see Curtis v. State</u>, 395 A.2d 464 (1978), and that <u>Morgan</u> did not create rights that were subject to the <u>Johnson</u>/<u>Fay</u> standard. The special circumstances exception did not apply, according to the Court of Appeals, because the principle announced by <u>Morgan</u> was already clearly established by the Supreme Court in <u>Ross v. Oklahoma</u>, 487 U.S. 81 (1988), and by Maryland in <u>Bowie v. State</u>, 595 A.2d 448, 457-59 (Md. 1991), and <u>Hunt v. State</u>, 583 A.2d 218, 231-34 (Md. 1990). <u>See Oken II</u>, 681 A.2d at 38. For the same reason, the Court of Appeals rejected Oken's argument that he was entitled to the benefit of <u>Morgan</u> as a new rule.

The Court of Appeals then proceeded to the merits of the <u>Morgan</u> claim and held that "[a]lthough better questions could have been asked," the voir dire conducted by the trial court was adequate to "life qualify" the jury. <u>See Oken v. State</u>, 681 A.2d 30, 40 (Md. 1996) (<u>Oken II</u>). One judge dissented. <u>See id.</u> at 53-59 (Bell, J., dissenting).

II.

To repeat, the Maryland Court of Appeals found that the <u>Morgan</u> issue had been waived on direct appeal. I agree with the majority that the Maryland court's grounds for finding waiver were independent of federal law and were constitutionally adequate. Oken's <u>Morgan</u> claim therefore is procedurally defaulted. I also agree that the only cause for Oken's procedural default was the ineffectiveness of his appellate

19

counsel and that he procedurally defaulted <u>that</u> claim when he failed to raise it before the Maryland Court of Appeals on appeal from the state habeas court. However, I do not agree that Oken was required under Maryland law to raise his ineffective assistance claim in his opening brief on appeal from the state habeas court. Had Oken actually argued ineffective assistance of appellate counsel in his reply brief, he would have preserved his <u>Morgan</u> claim.

The state had argued waiver before the state habeas court and lost because that court first decided the <u>Morgan</u> claim on the merits and then rejected Oken's claim of ineffective assistance of appellate counsel. <u>See Oken II</u>, 681 A.2d at 36 ("The State contended before [the state habeas court] and before this Court, that because Oken did not raise this claim on direct appeal, it is waived."); <u>id.</u> at 54 (Bell, J., dissenting) (recognizing that the state habeas court had "found, if only implicitly, sufficient `special circumstances' to excuse the appellant's failure to raise the <u>Morgan</u> issue on direct appeal"). Thus, when Oken filed his opening brief with the Maryland Court of Appeals on habeas, he was entitled to rely on the state habeas court's implicit holding that his substantive <u>Morgan</u> claim was preserved. In other words, since the state habeas court had not found the claim defaulted, Oken had no reason to argue cause for default in his opening brief on appeal.

The state, however, did argue default in its response brief. At that point, Oken was both entitled and obligated to contest the allegation of default, either by challenging waiver itself or by offering some cause supported by the record, such as ineffective assistance of appellate counsel. <u>See Federal Land Bank of Baltimore, Inc. v. Esham</u>, 406 A.2d 928, 936 (Md. Ct. Spec. App. 1979) ("The function of a reply brief is limited. The appellant has the opportunity and duty to use the opening salvo of his original brief to state and argue clearly each point of his appeal. We think that the reply brief must be limited to responding to the points and issues raised in the appellee's brief."); <u>id.</u> at 937 ("Due process requires that all parties have an opportunity to reply to new issues asserted against them . . . ."); <u>id.</u> ("The reply brief must do what it purports to do: it must respond to the points raised in the appellee's brief which, in turn, are addressed to the issues originally raised by the appellant."). Oken did contest the state's waiver argument for the first time in his reply brief, and the Maryland Court of Appeals considered his arguments on that point

20

without finding them abandoned. See Oken II, 681 A.2d at 36. Oken did not, however, make any argument that his appellate counsel had been ineffective. Thus, he abandoned his ineffective assistance of appellate counsel claim not because he raised it for the first time in his reply brief, but because he failed to raise it even then.**2**

III.

Oken raised the Morgan issue at trial, in the state habeas court, in his petition for leave to appeal the decision of the state habeas court, and in his opening brief, reply brief, and oral argument before the Maryland Court of Appeals on habeas. The trial court, the habeas court, and the Maryland Court of Appeals each considered the Morgan claim on the merits. Nonetheless, the claim is procedurally defaulted because his appellate counsel failed to raise it on direct appeal. And because the cause for that default was abandoned when Oken's habeas counsel mistook the Court of Appeals' grant of review for a grant of relief, the rule of procedural default precludes all federal review of Oken's Morgan claim. The majority's treatment of the merits of the Morgan claim therefore is dictum, but it is dictum that I cannot join. I believe that the voir dire conducted in this case was insufficient to identify jurors who would automatically impose the death penalty upon conviction.

A capital defendant has the right to challenge for cause any juror who "would unwaveringly impose death after a finding of guilt." Morgan, 504 U.S. at 733. See also Yeatts v. Angelone, 166 F.3d 255, 265 (4th Cir. 1999); Mackall v. Angelone, 131 F.3d 442, 450-51 (4th Cir. 1997). In order for the defendant to exercise that right effectively, the voir dire must include questions that "are enough to detect those in the venire who automatically would vote for the death penalty." Morgan, 504 U.S. at 734. "[G]eneral fairness and `follow the law' questions" are not enough. Id. See also id. at 735 ("As to general questions of fairness and impartiality, [jurors with dogmatic views on

_____

**2** Oken did state in his reply brief, in a footnote, that he had not waived his claim for ineffective assistance of appellate counsel. In order to preserve an issue on appeal, however, it is not enough simply to assert the claim; a party must provide supporting argument. See Federal Land Bank, 406 A.2d at 935-36.

the death penalty] could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial.").

The second, third, and fourth voir dire questions are unquestionably "general fairness and `follow the law' questions." See ante at 8 (listing questions). More importantly, they do not focus on the essential inquiry mandated by Morgan: the jurors' ability to give due consideration to mitigating evidence at sentencing. The majority concludes, however, that the first voir dire question, "Do you have any strong feelings, one way or the other, with regard to the death penalty?" was sufficient to root out any unconstitutional bias toward death. I disagree. As Oken has argued, the trial court's voir dire questions failed to identify venire members who would automatically impose the death penalty for particular crimes, such as a murder-rape. Prospective jurors might be able to answer "in all truth and candor" that they do not have strong views on the death penalty, yet at the same time believe that death invariably should be imposed when the murder is committed in the course of a sex offense. **3** Such jurors will vote to impose a sentence based solely on the proof of the offense itself. "But such jurors obviously deem mitigating evidence to be irrelevant to their decision to impose the death penalty: They not only refuse to give such evidence any weight but are also plainly saying that mitigating evidence is not worth their consideration and that they will not consider it." Id. at 736. The Morgan court was unequivocal. A juror who would "automatically vote for the death penalty without regard to the mitigating evidence is announcing an intention not to follow the instructions to consider the mitigating evidence." Id. at 738. Such a juror is not just merciless, he is "lawless." Id.

_____

**3** For instance, a juror might answer the trial court's question by saying that he does not have strong views on the death penalty, believing that it is warranted in some circumstances while not in others. See, e.g., JA 366 (statement of venire member K.: "I believe that [the death penalty] should be used when it's necessary."); JA 388 (statement of venire member B.: "it depends what the crime is . . ."), JA 397 (statement of venire member S. that "maybe" she has strong feelings about the death penalty; "it depends upon the situation"). These seemingly evenhanded responses easily might conceal an uncompromising belief that death is invariably warranted for patricides, infanticides, or murder-rapes, for example.

22

The question suggested by Oken and rejected by the trial court was directed precisely toward identifying "lawless" jurors who would not consider mitigating evidence: "Are there any murders or any type of murders where no matter what excuses or explanations are offered, you would feel that the person responsible should get the death penalty? What are they?" JA 28. <u>Compare Morgan</u>, 504 U.S. at 723 (trial court committed reversible error in refusing to ask proposed voir dire question: "If you found Derrick Morgan guilty, would you automatically vote to impose the death penalty no matter what the facts are?").

The trial court's first question, in contrast, was a vague, unfocused query about the venire members' "feelings" about the death penalty. The inherent ambiguity of that question was only worsened by the trial court's failure to explain to the prospective jurors that they would be required to consider mitigating and aggravating evidence at sentencing. Indeed, many of the venire members were unaware that the trial would be bifurcated into separate guilt and penalty phases. <u>See, e.g.</u>, JA 329-30. The obligation to consider mitigating evidence was never mentioned during voir dire. But "[m]embers of the venire cannot be expected to divine what attitudes and animosities the court and the parties want to know about. . . . If voir dire is to yield helpful information, the questions themselves must be framed so as to elicit concrete, candid responses." <u>United States v. Torres</u>, 191 F.3d 799, 813 (7th Cir. 1999) (Rovner, J., concurring). Stripped of any context, the trial court's unfocused inquiry into venire members' feelings about the death penalty could not reliably identify jurors whose bias in favor of the death penalty prevented them from considering mitigating evidence as required by the law.

A review of the voir dire reveals as much. In response to the question, "Do you have any strong feelings, one way or the other, regarding the death penalty," many venire members gave the same ambiguous response: "Not really." <u>See, e.g.</u>, JA 293, 304, 307, 330, 356, 385, 386, 388. When venire members responded with an unqualified "Yes," or even with expressions of support for the death penalty, the trial court frequently did no more than continue with its three "follow the law" questions, none of which concerned sentencing. Thus, venire persons who admitted strong feelings about the death penalty, <u>see</u> JA 357, 375-76, 395-96, 406, "favor[ed] the death penalty," JA 299, believed "it should be enforced," JA 382, or were "for it," JA

23

389-90, were asked no questions about how those feelings would affect their ability to consider mitigating evidence at sentencing. Given the number of ambiguous responses and the identical treatment of yes and no answers, it is difficult to believe that the voir dire conducted here served the purpose required by Morgan, that is, identifying jurors whose strong feelings about the death penalty would prevent them from sentencing in accordance with the law.

Because neither the voir dire questions themselves nor the context in which they were asked directed the venire members' attention to their obligation to consider mitigating evidence, this case has only a superficial similarity to United States v. Tipton, 90 F.3d 861 (4th Cir. 1996). In Tipton we emphasized the context in which the voir dire was conducted, particularly the way in which the jurors were reminded of the need to consider and weigh mitigating evidence:

> [T]he district court first explained to each juror that if guilt of a capital offense was found in a first stage of the trial, the jury would then consider whether to impose the death penalty in a second stage at which the Government would try to convince the jury that aggravating factors warranted death while the defense would try to convince the jury that because of mitigation, death was not appropriate, and that this was then to be decided by the jurors on the basis of that evidence and the court's instructions on the law. Against this background, the court then asked each prospective juror: "[D]o you have strong feelings in favor of the death penalty?" If the juror answered with an unqualified "No," the court moved on.

Tipton, 90 F.3d at 878. We concluded that "[u]nder all of the circumstances," the district court's voir dire did not violate Morgan. Id. at 879 (emphasizing "the question's logical adequacy to address the ultimate issue of death-penalty impartiality, the context in which it was put, [and] the court's repeated admonitions that under the law consideration of mitigating factors would be required"). Whereas the venire members in Tipton were made explicitly aware of the particular context in which their feelings on the death penalty were deemed relevant -- their obligation to weigh aggravating and mitigating evidence at

24

sentencing -- the venire members for Oken's trial were given no such information.

The voir dire conducted in this case could not reliably identify jurors who would invariably impose the death penalty based solely upon the crimes for which the defendant was convicted. As a result, I cannot discount the possibility that such jurors in fact sat on Oken's jury and voted for his death. Ambiguous, unfocused, and devoid of any context that would direct jurors to examine their ability to consider evidence offered in mitigation, the voir dire for Oken's trial violated the central requirement of Morgan. The Maryland Court of Appeals' conclusion that Morgan was satisfied thus was "contrary to" clearly established Supreme Court precedent. If the merits of that decision were before us, I would vote to grant the writ of habeas corpus and allow the State of Maryland to conduct a second sentencing proceeding.

25